INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL–CIO, Atlantic Coast District, ILA, AFL–CIO, Local 1233, ILA and Carol Gardner, Plaintiffs,

v.

The WATERFRONT COMMISSION OF NEW YORK HARBOR, New York Shipping Association, Inc., and Metropolitan Marine Maintenance Contractors Association, Inc., Defendants.

No. 79 Civ. 4267.

United States District Court,
S. D. New York.

June 25, 1980.

Gleason, Laitman & Mathews, New York City, for plaintiffs, International Longshoremen's Ass'n, AFL-CIO, Atlantic Coast Dist., ILA, AFL-CIO, and Local 1233, ILA, AFL-CIO, by Thomas W. Gleason, Ernest L. Mathews, Gary G. Nicolosi, New York City.

Brown & Brown, Jersey City, N. J., for plaintiff, Carol Gardner, by Raymond M. Brown, Jersey City, N. J.

Gerald P. Lally, Gen. Counsel, New York City, for defendant, The Waterfront Commission of New York Harbor, by Gerald P. Lally, David B. Greenfield, New York City.

Lorenz, Finn, Giardino & Lambos, New York City, for defendant, New York Shipping Association, Inc., by C. P. Lambos, Donato Caruso, New York City.

Greene & Bonaguidi, New York City, for defendant, Metropolitan Marine Maintenance Contractors Association, Inc., by James P. Corcoran, New York City.

Schulman & Abarbanel, New York City, for intervenor, Local 814, International Longshoremen's Association, AFL-CIO, by Howard Schulman, David Jaffe, New York City.

Robert Abrams, Atty. Gen. of the State of New York, New York City, for intervenor, New York State, by Amy Juviler, Stephen A. Marcus, Asst. Attys. Gen., New York City.

## OPINION

SOFAER, District Judge:

This suit was commenced by plaintiffs International Longshoremen's Association ("ILA"), Atlanta Coast District, ILA, AFL-CIO, and Local 1233, ILA, seeking to enjoin enforcement on statutory and constitutional grounds of Section 8 of the New York Waterfront Commission Act ("WCA § 8"), N.Y.Unconsol.Laws (65) § 9933 (McKinney 1974). Defendants are the Waterfront Commission of New York Harbor ("Commission"), an instrumentality created to enforce the Waterfront Commission Compact ("Compact"); and the New York Shipping Association, Inc. ("NYSA") and Metropoli-

tan Marine Maintenance Contractors Association, Inc. ("MMCA"), two organizations of employers which, under a collective bargaining agreement with the ILA, collect and pay to the ILA dues from union members. No genuine issues of material fact exist, and all the parties have moved for summary judgment.[1] Judgment is now granted to each of the parties in accordance with the following opinion. In summary, an injunction is denied in all respects, since it is unnecessary. The following declaratory judgment is entered, however: (1) WCA § 8 may lawfully be enforced against individuals whom it disqualifies from service as waterfront union employees; (2) WCA § 8 may not lawfully be enforced against persons other than disqualified union employees for collecting and distributing union dues; and (3) WCA § 8 may lawfully be enforced against the ILA or its officers for knowingly employing a disqualified individual.

Numerous challenges have been made in this case to the legality and application of WCA § 8. These challenges have in turn raised jurisdictional questions. A brief review of the Compact, the WCA, and of section 8 in particular, will clarify the parties' respective positions. Some of the matters being disputed relate to whether certain union officials, recently sentenced after trial, should be forced out of their union jobs now rather than after their appeals have been completed. Other issues are of far greater import, pertaining to the standards which govern the States of New York and New Jersey when they regulate unions and employers to achieve the legitimate objective of forcing convicted criminals out of waterfront union employment.

---

1. Several prior orders have been entered in this case. On August 22, 1979, a preliminary injunction issued against enforcement of WCA § 8 on the basis of the plaintiff Gardner's conviction. That decision was based on a likelihood of irreparable injury, the presentation of substantial questions, and a balance of hardships overwhelmingly in favor of plaintiffs and the employer defendants, who have joined in all the plaintiffs' arguments in this litigation. Memo. Opinion, 79 Civ. 4267 (Aug. 27, 1979). The motions for summary judgment were argued on October 24, 1979. Decision was re-

served. Additional convictions of union officers in January 1980 led plaintiffs to seek additional preliminary relief, and defendants to ask the court to vacate the preliminary relief already issued. The scope of the existing injunction was clarified at a hearing on January 31, 1980, and in a memorandum dated Feb. 4, 1980. Thereafter, rulings on all pending requests were delivered orally on February 21, 1980, and formally incorporated into an Order dated February 25, 1980. Those rulings are now rendered moot by entry of final judgment.

## I. THE WATERFRONT COMMISSION ACT AND SECTION 8

Waterfront employment in New York Harbor is governed by the Waterfront and Airport Commission Act ("WCA"), Chap. 1, Title 29, N.Y.Unconsol.Laws (65), §§ 9801 *et seq.* (McKinney 1974) ("N.Y.Laws"). The Act is divided into three parts. Part I, comprising Sections 9801 to 9873, is a restatement of the Waterfront Commission Compact consented to by Congress on August 12, 1953. 67 U.S.Stat. 541 (1953). Parts II and III of the Act, covering respectively Sections 9901 to 9920, and Sections 9931 to 9937, contain supplementary provisions, including regulations and prohibitions, which have been enacted by New York and New Jersey, with only slight variation, but have not been consented to by Congress. Section 8 of the WCA, the provision challenged in this action, is found in Part III.

■ The Compact's background and objectives have been discussed in several decisions, most notably *De Veau v. Braisted*, 363 U.S. 144, 80 S.Ct. 1146, 4 L.Ed.2d 1109 (1960); *Bradley v. Waterfront Comm'n of N.Y. Harbor*, 12 N.Y.2d 276, 239 N.Y.S.2d 97, 189 N.E.2d 601 (1963); and *Hazelton v.*

*Murray*, 21 N.J. 115, 121 A.2d 1 (1956). A central purpose of the "drastic reform" implemented by the Compact was to eliminate the presence of corrupt and irresponsible persons in any waterfront employment. *De Veau, supra*, 363 U.S. at 147, 80 S.Ct. at 1148. To accomplish this end, the Compact created the Waterfront Commission, granting it extensive administrative, adjudicatory and enforcement powers. Among the Commission's primary tasks is the supervision of a detailed licensing procedure for several employment categories, all of which were found to be "affected with a public interest." N.Y.Laws § 9805. The Commission is authorized to deny, revoke, cancel or suspend certain licenses or registrations if the applicant or licensee has "without subsequent pardon, been convicted" by any state or federal court of certain crimes. N.Y.Laws §§ 9814(b), 9818(c) (pier superintendents and hiring agents); §§ 9821(e), 9824(a) (stevedores); §§ 9829(a), 9831(a) (longshoremen); §§ 9841(b), 9844(a) (port watchmen).[2] To deny, revoke, cancel or suspend a license or registration, however, the Commission must follow certain procedures, designed to protect the rights of the applicant or licensee. *See* N.Y.Laws §§ 9845, 9846.[3]

---

**2.** The crimes covered by these provisions are described with considerable specificity in Section 9814(b), N.Y.Laws, and an exception is made for some categories of employees who prove to the Commission that they have behaved well for a period of five years.

**3.** To revoke, cancel or suspend a license or registration the Commission must hold a hearing, upon ten days notice, at which the licensee or registrant is afforded an opportunity to be heard. N.Y.Laws § 9847. No order revoking, cancelling or suspending a license or registration is effective for at least fifteen days after notice of hearing unless the Commission concludes such action is necessary for the public peace or safety. *Id.* The hearing officer designated by the Commission is empowered and required to issue subpoenas at the request of the parties, and is not bound by technical rules of evidence or procedure. N.Y.Laws § 9849. The Commission, upon conclusion of a hearing, "shall take such action upon such findings and determination as it deems proper and shall execute an order carrying such findings into effect," including granting or denying applications, revoking or suspending licenses or registrations, a reprimand, or dismissal of charges.

N.Y.Laws § 9850. Any action adverse to an employee is "subject to judicial review" in the manner normally allowed for review of agency action. N.Y.Laws § 9851. But the reviewing court may stay a suspension, revocation, or removal of registration for not more than thirty days. *Id.*

These procedural safeguards are mandated in all cases covered by the Compact, but the Commission is given a special power to suspend temporarily a license or registration, pending the required hearing. Such extraordinary action is allowed only "if in the opinion of the Commission the continuance of the license or registration for such period is inimicable to the public peace or safety." N.Y.Laws § 9848. At least one New York court has ruled that, while this power is not limited to the possibility of conduct that could create public disorder, the Commission is required in temporarily suspending a regulated employee to relate the charges made to the public safety or public peace, and to do more than merely recite the statutory language. *McNamara v. Waterfront Comm'n of N.Y. Harbor*, 11 A.D.2d 1017, 206 N.Y.S.2d 479 (1st Dep't. 1960).

The Compact anticipates that this statutory scheme may lead to regulatory efforts that conflict with national labor policy. It provides explicit safeguards against such efforts. Thus, N.Y.Laws § 9868 states that the "compact is not designed and shall not be construed to limit in any way any rights granted or derived from any other statute or any rule of law for employees to organize," to bargain collectively, to strike, and to act in any other way individually, collectively, and through labor organizations "or other representatives of their own choosing." *See also* N.Y.Laws § 9869. At the same time, N.Y.Laws § 9872 provides that the Compact "shall be liberally construed to eliminate the evils described therein and to effectuate the purposes thereof."

The Compact has been supplemented by provisions as extensive and important as those it contains. Many of these were adopted contemporaneously with the Compact in 1953, but have never been approved by Congress.[4] Section 8 of the WCA, the statute challenged in this lawsuit, is one of these supplementary provisions. A slightly different version has been adopted by New Jersey.[5]

Section 8 has proved the WCA's most controversial provision. Like the licensing regulations set forth in the Compact, WCA § 8 sets employment qualifications, but for waterfront unions rather than waterfront workers. The statute limits those who may serve as officers, agents or employees of any waterfront union, which in practical effect means the ILA. In contrast to the Compact's regulatory scheme, however, WCA § 8 establishes no licensing or registration mechanism, no hearing procedure, no right to judicial review. In its present form, it simply imposes criminal penalties for violating any of three prohibitions relating directly or indirectly to the employment by a waterfront union of certain "convicted" officers or employees.

The first prohibition of WCA § 8, and the only part in the section as adopted in 1953, is its most inclusive and potentially consequential. It prohibits any "person" (defined in the Compact to include virtually any individual or entity imaginable other than a governmental unit, N.Y.Laws § 9806), from soliciting, collecting or receiving any dues or other charges within New York for or on behalf of any labor organization representing the employees regulated by the WCA, "if any officer, agent or employee" of such labor organization or of a fund it administers "has been convicted" of certain crimes by a federal or state court, unless he has been subsequently pardoned or has received an appropriate certificate of good conduct. The convictions presently covered by this section include all felonies, "any misdemeanor involving moral turpitude," and certain other crimes or offenses. *See* N.Y.Laws § 9918(3)(b). This prohibi-

---

**4.** Among these are administrative provisions, definitions, funding arrangements, and more detailed procedures for Commission hearings. N.Y.Laws §§ 9901–9911. The bases for denying applications by prospective licensees or registrants is expended to include, among other things, conviction of any misdemeanor and several "offenses". N.Y.Laws § 9912. The grounds for revocation are also expanded to include, among other things, conviction of any crime or offense relating to gambling if committed on or near the docks. N.Y.Laws § 9913. And a new category of regulated employment is created—longshoremen qualified to work as checkers. N.Y.Laws § 9918.

**5.** In addition to the dues collection prohibition, Section 32:23–80.2 of the New Jersey Act provides, like its New York counterpart, direct sanctions against union officers and employees who continue to serve after conviction, as well as against all "persons" who "knowingly per-

mit" such officer and employees to hold office in violation of the section. N.J.Stat.Ann. 32:23–80.2.

In contrast with the New York provisions, however, Section 32:23–80.2 also expressly provides for injunctive relief to compel compliance:

> The Commission may maintain a civil action against any person, labor organization, welfare fund or trust or officers thereof to compel compliance with this section, or to prevent any violations, the aiding and abetting thereof, or any attempt or conspiracy to violate this section, either by mandamus, injunction or action or proceeding in lieu of prerogative writ and upon a proper showing a temporary restraining order or other appropriate temporary order shall be granted ex parte and without bond pending final hearing and determination.

tion seems clearly to apply to employers and organizations such as NYSA and MMCA that aid in the collection of union dues or other charges. The provision also seems applicable to union officials, or locals, or anyone else participating in dues collection, including those individuals disqualified by the statute from union employment.

WCA 8's second prohibition, adopted in 1969, is its most narrow and discriminate. It simply prohibits any person "so convicted" from serving as an officer, agent or employee of a labor organization or fund, unless he has been pardoned or received the requisite certificate of good conduct. It applies only to disqualified individuals.

The third prohibition of WCA § 8, also adopted in 1969, is that "no person," including the labor organizations covered by the section, "shall knowingly permit such convicted person to assume or hold any office, agency, or employment in violation of this section." Though the statute's language prohibits employing a disqualified individual in any capacity, the Commission is authorized, in its discretion, to exempt certain salaried workers, who "perform manual, mechanical or physical work of a routine or clerical nature." N.Y.Laws § 9934. No such discretionary exemption is permitted for union officials or managerial employees.

## II. *PROCEDURAL HISTORY AND CONTENTIONS*

On May 23, 1979, Carol Gardner, Assistant General Organizer of the ILA and President of Local 1233, was convicted in this district for violating 29 U.S.C. § 186(b) by receiving four loans totalling $68,000 that were arranged by an officer of an employer of unionized longshoremen. Gardner was

sentenced to one year imprisonment and a fine of $40,000. By letter dated August 6, 1979, the Commissioner notified the ILA that it considered "Mr. Gardner's convictions to be misdemeanors involving moral turpitude" within the meaning of WCA § 8. The Commission informed the union that, "unless the said Carol Gardner resigns from each union office or position which he presently holds with the [ILA and its locals], a violation of the provisions of Section 8 . . . will occur each and every time union dues, assessments, levies, etc. are collected or received." The letter ended by quoting from the remaining provisions of WCA § 8. Simultaneously, the Commission informed the NYSA and MMCA that continued collection of union dues would violate the statute. These employer groups thereafter notified the ILA and Local 1233 that, as of August 30, 1979, they would cease paying to plaintiffs the funds they collected from union members pursuant to the collective bargaining agreement in force between the employers and the ILA and its locals.

Plaintiffs commenced this action on August 14, 1979, seeking injunctive and declaratory relief. Shortly thereafter, Carol Gardner was granted leave to intervene as a plaintiff. A preliminary injunction was entered on August 22, 1979, preventing enforcement of WCA § 8 pending final disposition.

During January 1980, five additional officers of the ILA were sentenced by federal courts after having been found guilty of violating various federal felony provisions.[6] As in the case of Gardner, the Commission, by letter, warned the ILA, NYSA and MMCA, as well as each of the officers con-

---

**6.** On January 11, 1980, George Barone (ILA Vice-President, President of Local 1922, Miami, Florida and a paid official of Local 1804, New York, New York), William Boyle (ILA Vice-President, a member of the Executive Board, South Atlantic and Gulf Coast District, ILA, and Secretary of Local 1922, Miami, Florida), Landon Williams (ILA Vice-President, a member of the Executive Board, South Atlantic and Gulf Coast District, ILA, and President of Locals 1408, 1408–A and 1597, Jacksonville, Florida) and James Vanderwyde (Special Organizer of Atlantic Coast District, ILA, AFL–

CIO) were sentenced after having been found guilty in the United States District Court for the Southern District of Florida of violations of 29 U.S.C. § 186(b), 18 U.S.C. §§ 2, 1962(b), 1963 and 26 U.S.C. §§ 7201 and 7206(1). On January 22, 1980, Anthony Scotto (Vice-President and General Organizer of the ILA and President of Local 1814, Brooklyn, New York) was sentenced in the Southern District of New York after having been found guilty of violations of 29 U.S.C. § 186(b), 18 U.S.C. §§ 2, 1962(b), 1963 and 26 U.S.C. §§ 7201 and 7206(1).

cerned, some of whom serve outside the Port of New York, that during the incumbency of these officers "a violation of Section 8 will occur each and every time dues, assessments, etc. are collected or received in the States of New York and New Jersey on behalf of any entity covered by Section 8." The Commission's letters referred as well to the parts of WCA § 8 making it a misdemeanor for certain convicted officers to serve in a union position or for any person knowingly to permit such an officer to serve. These letters led the plaintiff unions to move for leave to file an amended and supplemental complaint, and to modify the existing preliminary injunction to cover all cases similar to that of Gardner.

Meanwhile, the Commission moved on January 14, 1980, to vacate the preliminary restraints in effect since August 22, 1979. On January 31, 1980, the court denied the Commission's motion to vacate, granted plaintiffs' motion to amend, and modified the preliminary injunction previously in force. The modified preliminary injunction prohibited enforcement against any person of WCA § 8's prohibitions aimed at dues collection and at persons who permit "convicted" individuals to serve in union positions. At the same time, a temporary restraining order was granted against enforcement of that part of WCA § 8 that made it a misdemeanor for persons disqualified by the statute to serve in union positions. After further briefing, however, this temporary restraint was vacated on February 21, in an order leaving the Commission free to enforce WCA § 8 against union employees who continued to serve despite their disqualification as "convicted" individuals, and to seek authority from the court to enforce the other parts of WCA § 8 upon a showing that such enforcement is necessary to achieve the statute's objectives. No such application has been made. Finally, during the course of these proceedings, the Attorney General of New York has been joined as a defendant, and ILA Local 1814 (which employs two "convicted" officers) has been joined as a plaintiff.

Plaintiffs' attack on WCA § 8 concerns, first, its threatened enforcement under the circumstances presented in this case. Thus, plaintiffs argue that, as a matter of statutory construction, the union officials covered by the amended complaint have not been "convicted" within the meaning of WCA § 8, since the officials' appeals from the judgments against them have not been exhausted. Furthermore, plaintiffs contend, if "conviction" is interpreted to occur at the time of sentence, as the Commission argues, such an interpretation conflicts with federal labor law and thus violates the Supremacy Clause of the United States Constitution. Plaintiffs also contend that Carol Gardner's conviction under 29 U.S.C. § 186(b)(1) is not a conviction of a "misdemeanor involving moral turpitude" within the meaning of WCA § 8. They argue, moreover, that WCA § 8's inclusion of "misdemeanors involving moral turpitude" as a basis for disqualifying a union official conflicts with, and is pre-empted by, standards established by the federal labor laws.

Plaintiffs also challenge the validity of WCA § 8 on broad federal grounds. In addition to the supremacy arguments noted above, they contend that, despite the Supreme Court's decision in *De Veau v. Braisted, supra,* WCA § 8 conflicts with federal labor policy as reflected by Sections 1 and 7 of the National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 151, 157; Section 504 of the Labor-Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 504(c); and Section 411(c)(1) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1111(c)(1). Plaintiffs further claim that aspects of WCA § 8 violate due process and equal protection as guaranteed by the Fourteenth Amendment, as well as the First Amendment right of union members freely to associate. Defendants controvert all these contentions.

### III. ABSTENTION

The threshold questions presented are whether, as the State of New York argues, an injunction should be denied because of pending state proceedings, *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); and, alternatively,

whether the state courts ought to be permitted to construe WCA § 8 before a federal court reaches federal statutory or constitutional issues, *Railroad Comm'n of Texas v. Pullman*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

*Younger* requires the federal courts ordinarily to abstain from interfering with state criminal proceedings, once initiated. 401 U.S. at 46, 49, 91 S.Ct. at 751, 753. This doctrine, based on considerations of federalism, has also been held to govern the issuance of injunctions against enforcement of a state court judgment in a nuisance case, *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 603, 95 S.Ct. 1200, 1207, 43 L.Ed.2d 482 (1975) ("more akin to a criminal prosecution than are most civil cases"); of contempt proceedings, *Juidice v. Vail*, 430 U.S. 327, 338, 97 S.Ct. 1211, 1218, 51 L.Ed.2d 376 (1977); and of "civil proceedings in which important state interests are involved," *Moore v. Sims*, 442 U.S. 415, 423, 99 S.Ct. 2371, 2377, 60 L.Ed.2d 994 (1979) (custody proceeding for child abuse; interest in family relations and child welfare); *Trainor v. Hernandez*, 431 U.S. 434, 444, 97 S.Ct. 1911, 1918, 52 L.Ed.2d 486 (1977) (civil enforcement and attachment proceeding; interest in protecting integrity of public assistance program). Proper respect for important state interests has in fact led the Supreme Court to condemn injunctions against state officers even where no particular criminal or civil proceeding is pending. *O'Shea v. Littleton*, 414 U.S. 488, 500, 94 S.Ct. 669, 678, 38 L.Ed.2d 674 (1974) ("anticipatory interference in the state criminal processes"); *Rizzo v. Goode*, 423 U.S. 362, 378–80, 96 S.Ct. 598, 607–08, 46 L.Ed.2d 561 (1976) (extensive interference with state

law enforcement officials in management of police).

No criminal or civil proceeding was pending when the present action began, and none has been commenced despite this court's refusal to enjoin preliminarily the enforcement of WCA § 8 directly against union officials who have been found guilty and sentenced. New York's Attorney General contends that "the mailing of notice by the Commission . . . was a significant step in the State proceedings to enforce the State statute, whether criminally or civilly. So any injunction by this Court is an improper interference with State ongoing administrative enforcement proceedings." Brief for N. Y. State, p. 5. The State essentially argues that the Commission's letters gave notice of "incipient state proceedings," interference with which "will create an unnecessary frustration to valid state policy."

The Commission's warning letters were significant. Without them, plaintiffs might have failed to demonstrate a need for immediate relief.[7] But the letters no more commenced a proceeding than the policeman's warnings did in *Steffel v. Thompson*, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974). Even where a plaintiff has been restrained on a prosecutor's information, making a preliminary hearing imminent, no proceeding is deemed underway to make *Younger* applicable. *Gerstein v. Pugh*, 420 U.S. 103, 108, 95 S.Ct. 854, 860, 43 L.Ed.2d 54 (1975). While the Commission has broad power to institute proceedings in implementing its licensing responsibilities under the WCA, N.Y.Laws § 9849, it has no such responsibility or authority under WCA § 8.

---

7. The Commission's warnings distinguish this case from *Linehan v. Waterfront Comm'n of New York Harbor*, 116 F.Supp. 401, 405 (S.D. N.Y.1953), a pre-*Younger* case, in which Judge Weinfeld declined to consider similar challenges to WCA § 8 on the ground that plaintiffs had failed to establish "any immediate likelihood of irreparable damage requiring the intervention of a court of equity." In *Linehan*, the court noted that plaintiffs had failed to allege "any imminent prosecution," *id.* at 404, and there was a conflict among the various state defendants as to whether WCA § 8 even ap-

plied to the individual officer involved. In this case, by contrast, the Commission has clearly indicated its belief that WCA § 8 applies and that it intends to proceed under the statute. Plaintiffs "are thus not without some reason in fearing prosecution for violation of the" prohibitions of the statute. *See Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 [, 99 S.Ct. 2301, 2311, 60 L.Ed.2d 895] (1979). The threat of prosecution "cannot be characterized as " 'imaginary or speculative' . . . ." *Steffel v. Thompson*, 415 U.S. 452, 459, 94 S.Ct. 1209, 1215, 39 L.Ed.2d 505 (1974).

Authority to enforce WCA § 8 is vested directly in local prosecutors. The Commission's warning letter is in fact unnecessary to the statute's enforcement; it is at most a signal that, unless the perceived violation ceases, the Commission will refer the matter for prosecution. Finally, at no time prior to actual prosecution will plaintiffs in this case have "had an *opportunity* to present their federal claims in the state proceedings." *Juidice v. Vail, supra,* 430 U.S. at 337, 97 S.Ct. at 1218. To abstain in this context would force plaintiffs (and the employer defendants) to await prosecution before raising their defenses, or to avoid criminal liability by surrendering their claims,[8] some of which are based on the First Amendment.[9]

Nor does this case involve so great an interference with important state administrative functions that abstention is necessary despite the absence of any specific state proceeding. Unlike the judicial and prosecutorial functions impinged upon in *O'Shea* and *Rizzo, supra,* the Commission is a specialized agency, representing two states and approved by the federal government. Enforcement of WCA § 8 is undoubtedly an important and valid state objective. But, as several of the parties note, although the statute and the Compact are regarded as state legislation for many purposes,[10] they regulate conduct in an area of substantial federal interest.[11] Furthermore, this suit challenges only one, limited aspect of the Commission's responsibilities; it seeks no relief that would disrupt to any extent the Commission's primary function of regulating licensed or registered waterfront employees. Finally, because no state proceeding has been commenced, a declaratory judgment, which is a less harsh remedy than an injunction, entailing less federal intrusion, appears sufficient in this case. *See generally Steffel v. Thompson, supra,* 415 U.S. at 462–74, 94 S.Ct. at 1217–23.[12]

8. Such a result would conflict with the equitable notion on which *Younger* is based. The threat of prosecution where none has been commenced, as well as the real likelihood that the union or the employers might surrender their claims to avoid criminal liability, would appear in fact to provide the showing of "great and immediate irreparable injury" which *Younger* stated was sufficient to enjoin a prosecution already underway.

9. Several courts, most notably the Second Circuit, have recognized that abstention is generally less appropriate in first amendment and civil rights cases than in others. *E. g., McRedmond v. Wilson,* 533 F.2d 757, 760 (2d Cir. 1976); *St. Martin's Press, Inc. v. Carey,* 605 F.2d 41, 43 (2d Cir. 1979); *Natco Theatres Inc. v. Ratner,* 463 F.Supp. 1124 (S.D.N.Y.1979); *New York Civil Liberties Union, Inc. v. Acito,* 459 F.Supp. 75 (S.D.N.Y.1978).

10. *See, e. g., Lake Country Estates, Inc. v. Tahoe Regional Planning Agency,* 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979) (compact is state law for purposes of 42 U.S.C. § 1983). In *Ciccone v. Waterfront Comm'n of N. Y. Harbor,* 438 F.Supp. 55, 58 (S.D.N.Y.1977), the District Court held that the Commission is not a federal agency under the Freedom of Information Act. In *Bell v. Waterfront Comm'n of N. Y. Harbor,* 279 F.2d 853 (2d Cir. 1960), the Circuit Court treated the Commission as a state agency acting under state law.

11. Avoidance of crime on the waterfront, and in labor relations generally, is an objective which the federal government has pursued through detailed legislation, passed in the context of other federal laws that seek to protect the rights of workers to organize and bargain through representatives of their own choosing. Plaintiffs' challenges to WCA § 8 are in fact based largely upon claimed inconsistencies between WCA § 8, and federal statutory provisions.

12. Justice Brennan, in *Steffel v. Thompson, supra,* 415 U.S. at 462, 94 S.Ct. at 1217, succinctly summarized the reasons why the principles of equity, comity, and federalism have little force absent a pending state proceeding:

When no state criminal proceeding is pending at the time the federal complaint is filed, federal intervention does not result in duplicative legal proceedings or disruption of the state criminal justice system; nor can federal intervention, in that circumstance, be interpreted as reflecting negatively upon the state court's ability to enforce constitutional principles. In addition, while a pending state prosecution provides the federal plaintiff with a concrete opportunity to vindicate his constitutional rights, a refusal on the part of the federal courts to intervene when no state proceeding is pending may place the hapless plaintiff between the Scylla of intentionally flouting state law and the Charybdis of forgoing what he believes to be constitutionally protected activity in order to avoid becoming enmeshed in a criminal proceeding. *Cf. Dombrowski v. Pfister,* 380 U.S. 479, 490 [, 85 S.Ct. 1116, 1123, 14 L.Ed.2d 22] (1965).

Abstention on the basis of *Younger v. Harris* and its progeny is therefore inappropriate.

■■■ An argument for abstention is also possible for the reasons identified in *Railroad Commission of Texas v. Pullman, supra.* Abstention is normally required "where the challenged state statute is susceptible of a construction by the state judiciary that would avoid or modify the necessity of reaching a federal constitutional question." *Kusper v. Pontikes*, 414 U.S. 51, 54, 94 S.Ct. 303, 306, 38 L.Ed.2d 260 (1973). No party argues in favor of abstention on this ground, but it is sufficiently related to *Younger* abstention to merit discussion. *See Moore v. Sims, supra,* 442 U.S. at 427–28, 99 S.Ct. at 2379–80. Abstention may be required, moreover, even if no party requests it, *see Wisconsin v. Constantineau*, 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971), although the parties' desire to avoid the delay abstention frequently entails is a factor to consider in determining whether to abstain, *see Hostetter v. Idlewild Bon Voyage Liquor Corp.*, 377 U.S. 324, 329, 84 S.Ct. 1293, 1296, 12 L.Ed.2d 350 (1964).

The Supreme Court has mandated essentially "a two-step approach [in *Pullman* abstention] . . . (1) whether the state law is unclear and, if it is, whether state court resolution of the unclear state issue will obviate or modify the federal constitutional issue, and (2) whether the costs of abstention are too great in a particular case or there is some other aspect of the case which weighs in favor of or against abstention." 1A J. Moore, W. Taggart, A. Vestal & J. Wicker, *Moore's Federal Practice* ¶ 0.203[1], p. 2115 (2d ed. 1979). The process is more easily described than applied.

How "unclear" or "unsettled" must an issue of state law be to warrant abstention?

"The answer does not emerge easily from analysis of the decisions, since the Court frequently states only its conclusion on the point with little elaboration of its reasons." P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, *Hart & Wechsler's The Federal Courts and the Federal System* 991 (2d ed. 1973). A test suggested in *Pullman* itself would find most questions unsettled, since any federal judge's decision of an issue not authoritatively determined is "a forecast rather than a determination." *Railroad Comm'n of Texas v. Pullman Co., supra,* 312 U.S. at 499, 61 S.Ct. at 645. But the Court has more recently said that abstention is inappropriate merely because a state law issue is "doubtful." *Baggett v. Bullitt*, 377 U.S. 360, 375, 84 S.Ct. 1316, 1324, 12 L.Ed.2d 377 (1964). Even a question on which the state courts have not passed may be decided by federal courts under proper circumstances. *E. g., Doud v. Hodge*, 350 U.S. 485, 487, 76 S.Ct. 491, 492, 100 L.Ed. 577 (1956). Thus, although a two-step analysis seems desirable and orderly, the ultimate question may depend as much upon where the second step leads as the first.

Several state-law issues are presented, each of which must be separately considered. *See, e. g., Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 305–12, 99 S.Ct. 2301, 2312–16, 60 L.Ed.2d 895 (1979). The issues are described in detail below. It suffices here to note that, while the clarity of New York law differs on each of the issues presented, no substantial doubts exist as to how New York's courts will resolve any of the questions that need to be decided. *Compare id.* 307–12, 99 S.Ct. 2313–16.

Furthermore, although decisions on these state law issues might conceivably avoid some federal questions,[13] most of the difficult questions that could possibly be avoided

---

13. If this court were to abstain and the New York Court of Appeals were to conclude that an individual is not "convicted" until he has exhausted all appeals, it is conceivable that each conviction at issue in this case would be overturned on appeal, thereby rendering WCA § 8 inapplicable and obviating the need to decide any of the pre-emption and the broad constitutional issues presented in this case. But, as the Supreme Court has stated, "[t]here is a point . . . at which the possible benefits of abstention become too speculative to justify or require avoidance of the question presented." *Ohio Bureau of Employment Services v. Hodory*, 431 U.S. 471, 481, 97 S.Ct. 1898, 1905, 52 L.Ed.2d 513 (1977).

are federal pre-emption matters rather than ordinary questions of constitutional interpretation.[14] The interests that support *Pullman* abstention are to some extent applicable to pre-emption decisions.[15] Normally, however, a pre-emption decision is an exercise in determining Congress' intent, and is subject to legislative review. Such decisions, therefore, often lack that dangerous combination of judicial subjectivism and jurisprudential finality associated with constitutional determinations, which makes the avoidance of constitutional issues especially important.[16] The weight of authority seems in fact strongly against treating abstention as applicable to pre-emption decisions, even though they may be based ultimately upon the Supremacy Clause.[17] Furthermore, the development of several grounds for abstention other than *Pullman* assures that federal courts will abstain in appropriate cases involving important state

14. A state-court decision construing "conviction" to permit union officials who have been sentenced to serve until their appeals are exhausted would obviate the need to decide whether a construction that deemed individuals "convicted" upon their being found guilty is so inconsistent with federal labor law that it violates the supremacy clause. Likewise, a state-court determination that Gardner's conviction is not a misdemeanor involving moral turpitude would enable the federal courts to avoid determining whether a different result would conflict with federal laws, particularly Section 504 of the LMRDA, 29 U.S.C. § 504. Furthermore, if the state courts were to refuse to allow WCA § 8 to be applied to individuals elected by locals in states other than New York or New Jersey, the federal courts would be spared the problem of resolving arguments based on inconsistency with federal law and violation of the interstate commerce clause. Finally, were the state courts to refuse to allow enforcement of WCA § 8 against unions and employees until such enforcement were shown to be necessary, or to serve some purpose independent of securing the dismissal of disqualified union employees, the federal courts could avoid deciding whether unconditional enforcement of all parts of the statute violates federal labor laws or the freedom of association protected by the First Amendment.

15. Since pre-emption is based ultimately on the fundamental constitutional notion of federal supremacy, one could argue that avoiding a pre-emption question amounts to the avoidance of a constitutional issue, especially in an area such as labor law, where federal laws have been written and construed to incorporate those constitutional principles (such as freedom of association) that would have to be applied but for the presence of the federal statutes. Furthermore, a pre-emption decision may effectively nullify a state law, thereby presenting the same interest in limiting interference with the states, particularly upon the basis of a non-authoritative construction of state law. Finally, erroneous decisions of state law would appear to be equally embarrassing when they provide the basis for a federal pre-emption decision as when they lead to a constitutional determination. *See Druker v. Sullivan*,

458 F.2d 1272, 1274 (1st Cir. 1972). Leading authorities have, however, criticized the few courts that have treated abstention as equally applicable to federal constitutional and pre-emption issues. 17 Wright, Miller & Cooper, *Federal Practice and Procedure*, § 4242, pp. 454–55 (1978).

16. Wright, Miller & Cooper, *supra*, at 455, explain as follows:

It is true that technically a claim that a federal statute controls under the Supremacy Clause is a constitutional issue, but in another context the Supreme Court had distinguished Supremacy Clause claims from other constitutional claims. [Footnote omitted.] It seems proper to do so in the abstention area. The claim that a federal statute controls is essentially an exercise in construing the federal statute. Once its meaning has been determined, application of the Supremacy Clause poses no novel constitutional problem. The policy against unnecessary decision of constitutional questions does not reach unnecessary construction of statutes.

17. *See, e. g., Woe v. Nebraska State Department of Public Welfare*, 598 F.2d 1146, 1147–48 (8th Cir. 1979) (Lay, J., dissenting); *Rath Packing Co. v. Becker*, 530 F.2d 1295, 1307 (9th Cir. 1975), 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977). As the Supreme Court has noted in an analogous context, although pre-emption claims are "grounded in the Supremacy Clause of the Constitution . . . , [t]he basic question involved in [their resolution] is never one of interpretation of the Federal Constitution but inevitably one of comparing two statutes." *Swift & Co. v. Wickham*, 382 U.S. 111, 120, 86 S.Ct. 258, 263–64, 15 L.Ed.2d 194 (1965) (three-judge court not required where state statute challenged on statutory pre-emption grounds). In *Propper v. Clark*, 337 U.S. 472, 490, 69 S.Ct. 1333, 1343, 93 L.Ed. 1480 (1949), Justice Reed wrote in his opinion for the Court: "Where a case involves a nonconstitutional federal issue, however, the necessity for deciding which depends upon the decision on an underlying issue of state law, the practice in federal courts has been, when necessary, to decide both issues."

interests. No need exists to create a doctrinal basis for permitting federal courts to avoid exercising their ordinary and expected function of construing federal laws.[18]

■ Finally, the federal constitutional questions that would be avoided by certain possible interpretations of state law are insubstantial, and seem clearly to warrant rulings upholding the validity of those parts of WCA § 8 that are in question. In such a context—where the constitutional decisions reached by refusing to abstain uphold the state law—the potential for embarrassment or "needless friction with state policies," *Railroad Commission of Texas v. Pullman, supra,* 312 U.S. at 500, 61 S.Ct. at 645, is minimized, since the federal court decision on these issues does not foreclose the state court from later adopting a different, more restrictive construction of state law.[19]

The costs of abstention in this case are, moreover, too substantial to justify obtaining the minimal benefits that abstaining might confer. All the parties—save the intervenor New York State—oppose abstention, largely because of the delay it would cause. Time is particularly crucial to the Commission, since its principal aim here is to remove from union office those individuals who have been found guilty of crimes *before* their appeals have been exhausted. WCA § 8 loses much of its impact after appeals are final, since, at that point, federal law would usually make it unlawful for convicted officials to continue to serve the union. *See* 29 U.S.C. § 504. Thus, even a relatively short delay is likely to deprive the Commission of the opportunity to vindicate its reading of WCA § 8.

The impact of WCA § 8 on the employers, NYSA and MMCA, as well as on the public, must also be considered. The employers are faced with serious injury if WCA § 8 is enforced against them for collecting dues; they predict a strike if they fail to abide by collective bargaining agreements permitting a dues checkoff procedure. Their claims are based on federal pre-emption and constitutional arguments that almost certainly would not be avoided by abstaining on any state law question, and which therefore should be reached now rather than after a further period of delay and uncertainty. Finally, abstention would cause considerable judicial diseconomies in this case.[20]

## IV. ISSUES OF STATE LAW

### A. Meaning of Conviction

■ The sanctions of WCA § 8 are triggered when a union official or employee "has been convicted" of one of the enumerated crimes. Plaintiffs and defendants NYSA and MMCA argue that a "conviction" should be held to occur under WCA § 8 only after all appeals have been exhausted. They argue, in particular, that WCA § 8 should be interpreted consistently with related federal statutes, which expressly define conviction to mean the later of the date of the trial court's judgment or

---

**18.** *See* Wright, Miller & Cooper, *supra,* at 455. *See generally Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 814–17, 96 S.Ct. 1236, 1244–46, 47 L.Ed.2d 483 (1976) (Brennan, J.). Exceptional cases may, however, justify treating a pre-emption question as equivalent to a constitutional one. *Cf. Metlakatla Indian Community v. Egan,* 363 U.S. 555, 80 S.Ct. 1321, 4 L.Ed.2d 1397 (1960).

**19.** To this extent, a federal court's view of the merits is a relevant consideration in deciding whether to abstain. Where a federal court decides to invalidate a state statute on constitutional grounds, not only is there a risk that the federal ruling would merely be "a tentative answer which may be displaced tomorrow by a state adjudication," *Railroad Comm. of Texas v. Pullman, supra,* 312 U.S. at 500, 61 S.Ct. at 645, but the practical effect of the federal deci-

sion is to limit or preclude implementation of a statute that under controlling state law would have been constitutional, thereby triggering policy considerations underlying the related *Younger* doctrine.

**20.** Numerous pretrial motions have been made, necessitating several rounds of briefing and argument. Three separate written or oral opinions dealing with preliminary relief have issued. A state court judge would be required to spend many hours to become familiar with the arguments and issues presented. The briefs alone would require two uninterrupted days to read. This substantial expenditure of judicial resources is unjustified, given the relatively inconsequential benefits to federalism interests that may be derived.

of "the final sustaining of such judgment on appeal . . . ." [21]

No New York decision has addressed the meaning of conviction as used in WCA § 8. But in a thoughtful and well-reasoned decision, the New Jersey Superior Court recently held that an individual is "convicted" under New Jersey's counterpart to WCA § 8, N.J.Stat.Ann. 32:23–80 and 32:23–80.2, at the time a guilty verdict is returned or guilty plea is entered, and not after affirmance on appeal. *Local 1804, International Longshoremen's Association, AFL–CIO v. Waterfront Commission of New York Harbor*, 171 N.J.Super. 508, 410 A.2d 73 (1979). In the context of bi-state legislation designed to remedy problems shared by New York and New Jersey, a New York judge would naturally turn to this decision for guidance in construing New York's almost identical provision.[22]

Several New York decisions, involving the disqualification of attorneys and public officials, support the view that a "conviction" is usually held to occur no later than the time of sentence, before an appeal has been taken or exhausted. *E. g., Toro v. Malcolm*, 44 N.Y.2d 146, 404 N.Y.S.2d 558, 375 N.E.2d 739, *cert. denied*, 439 U.S. 837, 99 S.Ct. 121, 58 L.Ed.2d 133 (1978) (removal of city corrections officer); *Mitchell v. Association of the Bar, City of N. Y.*, 40 N.Y.2d 153, 386 N.Y.S.2d 95, 351 N.E.2d 743 (1976) (attorney disbarment). These holdings are consistent with the prevailing construction of "conviction" adopted among the states in interpreting analogous statutory and constitutional provisions that call for the prompt removal of persons from public office or other positions of trust. *See generally* "Officer—Conviction of Crime," *Annot.*, 71 A.L.R.2d 593 (1960). According to these cases, the purpose of disqualification statutes is not to punish the convicted officer or attorney but rather to protect the public; once the presumption of innocence is overcome at the trial court level, the public interest in prompt removal generally outweighs the interests of the individual officeholder.

This reasoning applies equally to waterfront union officials found guilty of serious crimes. The legislative findings that led New York to adopt WCA § 8 were that corrupt union officers were exploiting their positions for illegal purposes, including the misuse of union funds. These objectives are most effectively attained by removing individuals found guilty of serious crimes immediately rather than awaiting completion of often lengthy appellate procedures.

Plaintiffs' attempt to distinguish the New York cases is unpersuasive. They argue that those decisions involved statutes which, unlike WCA § 8, suggested on their face that the officer's removal should precede appellate review. In *Mitchell*, the statute governing disbarment expressly provided for reinstatement procedures upon reversal of an attorney's conviction. The statute at issue in *Toro*, N.Y.Pub.Off. § 30, declared that a public office "shall be va-

---

**21.** LMRDA § 504(c), 29 U.S.C. § 504(c), reads:

For the purposes of this section, any person shall be deemed to have been "convicted" and under the disability of "conviction" from the date of the judgment of the trial court or the date of the final sustaining of such judgment on appeal, whichever is the later event, regardless of whether such conviction occurred before or after September 14, 1959.

ERISA § 411(c)(1), 29 U.S.C. § 1111(c)(1) similarly reads:

A person shall be deemed to have been "convicted" and under the disability of "conviction" from the date of the judgment of the trial court or the date of the final sustaining of such judgment on appeal, whichever is the later event.

**22.** Plaintiffs claim that the relevant New York case law interpreting "conviction" speaks in terms of "judgment of conviction", which allegedly encompasses both verdict *and* the sentence, or the "time of sentence," whereas the New Jersey rule seems to fix "conviction" at the time of verdict or entry of a guilty plea. Any such disparity has been eliminated by *Gunning v. Codd*, 49 N.Y.2d 495, 427 N.Y.S.2d 209, 403 N.E.2d 1208 (1980), and would have been inconsequential for purposes of this litigation, since all the union officials covered by this suit have been sentenced. The dispositive fact is that New York and New Jersey agree to enforce statutes calling for the removal of "convicted" persons who hold positions of public trust during the pendency of appellate proceedings.

cant" upon the officer's conviction, language which plaintiffs contend shows the legislature intended immediate removal.

The language "shall be vacant" in the statute considered in *Toro*, suggests no greater degree of urgency than the language "no person . . . shall serve," found in WCA § 8. Furthermore, that WCA § 8 contains no explicit restoration provision, as does the statute in *Mitchell*, hardly establishes that the legislature intended to delay its enforcement pending all appeals. An individual disqualified from employment by WCA § 8, whose conviction is reversed on appeal, might be eligible for reinstatement because the "conviction" no longer exists. Whether a convicted officer or employee should be re-elected or rehired after his conviction is vacated on appeal is a decision which the legislature could reasonably have left to the union leadership or membership, while still intending that the individual be removed from office in the interim.[23]

In any event, the recent decision in *Gunning v. Codd*, 49 N.Y.2d 495, 427 N.Y.S.2d 209, 403 N.E.2d 1208 (1980) has apparently settled the question of the meaning of "conviction" in a statute like WCA § 8. In that case, the narrow issue addressed was whether "conviction" as used in N.Y.Pub. Off. § 30 occurred upon verdict or upon sentencing.[24] The New York Court of Appeals recognized that prior cases had defined "conviction" with a view toward achieving equitable consequences, and avoiding harsh results. Those decisions

were rejected. According to the Court, any confusion concerning "conviction" was laid to rest in 1971 when the legislature enacted Section 1.10 of the Criminal Procedure Law, which defined a conviction to occur upon "entry of a plea of guilty . . . or a verdict of guilty . . . ." "By its plain terms," the Court noted, "the provisions of the CPL apply 'to all matters of criminal procedure.'" 427 N.Y.S.2d at 211, 403 N.E.2d at 210. Indeed, the Court held that the "all-embracing" definition of conviction applied even to the civil statute in question. It follows that the same definition would apply under WCA § 8.

Finally, a construction of "conviction" that enables the Commission promptly to remove convicted union employees from office, finds added support in other provisions of the Compact and supplementary legislation. N.Y.Laws, § 9921, for example, authorizes the Commission to suspend temporarily the license or registration of certain waterfront employees who have merely been indicted or charged with various crimes. The Compact itself permits revocation or suspension of a waterfront employee's license without the institution of criminal proceedings; simply engaging in certain conduct or acting in violation of the Compact may be sufficient grounds for disciplinary action. See N.Y.Laws §§ 9818, 9824(e), 9831(f) and 9844(c).

█ In light of these authorities, plaintiffs' argument that the meaning of conviction under WCA § 8 should be determined

---

**23.** WCA § 8's disqualification procedure is closely analogous to the approach taken by the New York legislature in providing for removal of public officers under Section 30 of the Public Officers Law. In holding that an officer convicted of a felony automatically loses his office and is not entitled to reinstatement after reversal, the court in *Toro v. Malcolm, supra*, 404 N.Y.S.2d at 562, 375 N.E.2d at 743, reasoned:

> In weighing the interest of a public officer convicted of a felony, whether justly or unjustly, against that of the public, the balance must be struck in favor of the public's right to rest assured that its officers are individuals of moral integrity in whom they may, without second thought, place their confidence and trust. [Citations omitted.] A felony conviction, notwithstanding its reversal

> on appeal, may in many cases shatter this ideal. To avoid this occurrence, we believe the Legislature has chosen to vacate a public office upon the officer's conviction of a felony.

**24.** *Gunning* involved a police officer who attempted to retire from his job immediately after he was found guilty by a jury of official misconduct and bribery, but before he had been sentenced. The Police Department served an order dismissing the officer, claiming his removal from office had occurred when he was found guilty. The officer argued that his conviction became effective under Section 30 of the Public Officers Law only when a judgment of conviction was entered.

so as to avoid inconsistency with federal labor law statutes, LMRDA § 504(c) and ERISA § 411(c)(1), must be rejected. To construe WCA § 8 consistently with federal laws, might avoid the need to decide whether WCA § 8 is invalid under the Supremacy Clause, and might also create a more easily administered, sensible and humane rule.[25] But a federal court is not free to construe a state's laws to avoid possible conflict with federal laws where it is clear the state's courts would face the alleged conflict.

### B. *Meaning of Moral Turpitude*

■ Plaintiffs argue that Gardner's conviction under Section 302(b)(1) of the Taft-Hartley Act ("LMRDA § 302"), 29 U.S.C. § 186(b)(1), for requesting and receiving a loan from an employer of ILA members whom he represents, does not constitute a "misdemeanor involving moral turpitude" within the meaning of WCA § 8.[26]

Although the term "moral turpitude" has survived a void for vagueness challenge, *Jordan v. De George*, 341 U.S. 223, 229–30, 71 S.Ct. 703, 95 L.Ed. 886 (1951), precise definition is elusive. The uncertainty stems in part from the varied use to which the phrase is put, ranging from the disbarment of attorneys and the disqualification of jurors under state law to the deportation of aliens under the federal immigration laws.

One New York court adopted the following definition of moral turpitude in defining slander *per se*:

Moral turpitude is an act of baseness, vileness or depravity in the private or social duties which a man owes to his fellowmen or to society in general, contrary to the accepted and customary rule of right and duty between man and man.

*Mishkin v. Roreck*, 202 Misc. 653, 115 N.Y. S.2d 269, 272 (Sup.Ct.Nassau Co.1952) (quoting Newell [4th Ed.] § 32). Moral turpitude has also been described as the "quality of a crime involving grave infringement of the moral sentiment of the community as distinguished from statutory *mala prohibita.*" *People v. Ferguson*, 55 Misc.2d 711, 286 N.Y.S.2d 976, 981 (Sup.Ct. Queens Co.1968) (quoting Merriam-Webster's New Int'l Dict. [2d Ed.]). Such abstract definitions provide little guidance for a court called upon to apply the term in a given case. As the New Jersey courts have noted, "the attempt to apply these definitions to specific criminal acts . . . has demonstrated only the elasticity of the phrase and its necessarily adaptive character, reflective at all times of the common moral sense prevailing throughout the community." *State Board of Medical Examiners v. Weiner*, 68 N.J.Super. 468, 484, 172 A.2d 661, 669 (App.Div.1961), quoted with approval in *Makwinski v. State, Board of Commissioners, Consolidated Police and Firemen's Pension Fund*, 76 N.J. 87, 385 A.2d 1227, 1230 (1978).

Gardner's conduct in requesting and accepting a loan in violation of Section 302 appears to satisfy these traditional definitions of moral turpitude. As a union official, he not only had a legal obligation but also a moral obligation to represent the interests of ILA members zealously, and therefore to maintain at all times an arms-length relationship with management. By entering into a loan transaction with a union employer, and thereby potentially creating a conflict between his personal interests and the interests of the workers he represented, he plainly acted "contrary to the

---

**25.** Plaintiffs point out that, with respect to some of the officers covered by this suit, the sentencing courts expressly stated that their convictions should not bar their union activities pending appeal. (See Feb. 9, 1980 Aff. of Gleason, ¶ 5a.) These expressions cannot, however, be regarded as limiting the Commission's power to recommend, and New York's power to enforce, an otherwise permissible interpretation of a New York criminal statute.

**26.** WCA § 8, as amended in 1961, prohibits a person from serving as an officer, agent, or employee of a waterfront labor organization if he "has been convicted by a court of the United States, or any state or territory thereof, of a felony, any misdemeanor involving moral turpitude or any crime or offense enumerated in subdivision three (b) of section five-n of this act, unless he has been subsequently pardoned . . . ." N.Y.Laws § 9933; *see also* N.J.Stat. Ann. 32:23–80.

accepted and customary rule of right and duty" established in the union community.[27]

Plaintiffs correctly urge a less subjective or moralistic approach in defining moral turpitude than the courts have traditionally adopted. The better and more reasoned inquiry focuses on its meaning "in light of the mischief to be corrected and the end to be attained." *Warner v. Goltra*, 293 U.S. 155, 158, 55 S.Ct. 46, 48, 79 L.Ed. 254 (1934). Even by this more functional test, however, Gardner's conduct justifies his removal. The mischief sought to be corrected by the Compact and its supplementary provisions is corruption on the waterfront. In particular, Congress and the legislatures of New York and New Jersey seek to combat the corrupting influence of irresponsible and dishonest union officials who use their positions for personal gain. To hold that a violation of Section 302 is a misdemeanor of moral turpitude is wholly consistent with this legislative aim.

■ Adopted during the same period as the Compact, Section 302 was designed to prohibit "all forms of extortion and bribery in labor management relations . . . ." S.Rep. No. 187 on S. 1555 as reported, 86th Cong., 1st Sess., at 13 (1959), reprinted in U.S.Code Cong. & Admin.News at 2329. "The chief, if not only, purpose of the section was to put a stop to practices that, if unchecked, might impair the impartiality of union 'representatives.'" *United States v. Ryan*, 232 F.2d 481, 483 (2d Cir. 1956). Pervasive corruption in certain segments of organized labor apparently led Congress to adopt a bright line test, outlawing *any* payment, with stated exceptions, regardless of motive or intent. That the statute does not require a showing of "conscious wrongdoing," *e. g., United States v. Ricciardi*, 357 F.2d 91, 100 (2d Cir.), *cert. denied*, 384 U.S. 942, 86 S.Ct. 1464, 16 L.Ed.2d 540 (1966), does not mean a violation of its provisions may be regarded as trivial. On the contrary, it means that Congress regarded any payment or loan between management and union members and representatives as potentially corrupting, and so utterly lacking in any legitimate justification that all such transactions should be prohibited. *See United States v. Ryan, supra*, 232 F.2d at 483.

Plaintiffs argue that Congress made Section 302 so broad and inclusive that it could conceivably cover acts which are relatively innocent and "inconsiderable and harmless in themselves," *id.*, for example, an innocently intended holiday gift. According to plaintiff, this type of conduct cannot in itself be deemed to involve "moral turpitude." In particular, plaintiffs note that the federal courts, in enforcing Section 212(a)(9) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1182(a)(9), have required that moral turpitude "be inherent in, or an essential ingredient of, the crime. If a person not guilty of moral turpitude may nevertheless be convicted of the crime, the offense cannot be said to involve moral turpitude for purposes of . . . [Section 212(a)(9)]" *Ablett v. Brownell*, 240 F.2d 625, 627 (D.C.Cir. 1957). *Accord, United States v. Uhl*, 107 F.2d 399 (2d Cir. 1939); *United States v. Neelly*, 208 F.2d 337 (7th Cir. 1953). Under this standard, even assuming Gardner's individual conduct was morally base in light of his responsibilities, a conviction under Section 302 could not be deemed to involve moral turpitude under WCA § 8.

But why should a New York court construe WCA § 8 to incorporate the extraordinarily restrictive definition of moral turpitude applied by federal courts in deportation proceedings?[28] In construing "moral

**27.** *See* N.Y.Labor Law § 722, establishing fiduciary obligations of union officers and agents, and § 723(e) specifically prohibiting officers from receiving, "directly or indirectly, any payments, loans or gifts from" a union employer. *See also* 29 U.S.C. § 501(a), establishing the fiduciary responsibilities of union officers, and, in particular, prohibiting an officer "from holding or acquiring any pecuniary or personal interest which conflicts with the interests of" the union.

**28.** If "moral turpitude" under WCA § 8 turned on the specific conduct for which individuals are convicted under Section 302, Gardner should nevertheless be prohibited from waterfront union employment. The evidence at Gardner's trial showed that he received four

turpitude" under INS § 212(a)(9), federal courts have been profoundly influenced by the grave consequences of deportation—the "dreadful penalty of banishment." *United States v. Uhl, supra*, 107 F.2d at 400. Deportation is a remedy that necessarily implies a judgment that the individual involved is unfit to live in this nation. So comprehensive a condemnation calls for an extremely reliable predicate, and for a standard of review that would avoid even a slight possibility that any individual would be found deportable without ample justification. A finding of moral turpitude under WCA § 8 entails far less serious consequences than deportation; individuals convicted of misdemeanors involving moral turpitude are prohibited from working for unions on the New York-New Jersey waterfront. This less drastic sanction involves a more limited judgment of the individual's fitness than does deportation, and therefore permits a less rigorous predicate.

■ Whatever "moral turpitude" may be held to mean under WCA § 8 in dealing with misdemeanors having little or no relationship to the responsibilities of labor officials, the phrase should be construed to include misconduct which touches upon the essence of a union official's role as a fiduciary.[29] To hold that no violation of Section 302 could ever be an act of moral turpitude because of a theoretical possibility that an innocent and trifling payment would fall within its scope would pointlessly frustrate the core purposes of WCA § 8.

loans, totalling $68,000.00, from an employer, Irving Held, and that he tried to keep these transactions secret. The transcript of Gardner's sentencing has been ordered sealed, but the "corrupt" and "rotten" nature of these transactions is indicated by Chief Judge MacMahon's comments in sentencing Held. As the Chief Judge observed, the "plain design [of these loans] was to influence [Gardner] in his position as a labor representative." (Sentencing transcript pp. 16–17.)

**29.** The WCA's primary concern is with crimes related to waterfront employment. WCA § 8 disqualifies persons convicted, not only of misdemeanors involving moral turpitude, but also of certain enumerated crimes and offenses, including "petty larceny, where the evidence shows the property was stolen from a vessel, pier, or other waterfront terminal." *See* WCA

## C. *"Persons" Covered by Section 8*

■ Several issues exist concerning the meaning of "persons" as it is used in various parts of WCA § 8. First, plaintiffs contend that "persons" who serve as officers in ILA locals in states other than New York and New Jersey cannot be prosecuted under WCA § 8, because their activities are unrelated to the New York waterfront. The NYSA also contends that WCA § 8 should not be enforced against these individuals because of unsettling consequences that might be caused if activities unrelated to the New York waterfront are prosecuted here. Had the Commission or New York State urged that WCA § 8 could be applied against ILA employees convicted, for example, in Florida, who have no connection with or authority over labor relations on the New York waterfront, then a substantial question might have been presented as to how New York's courts would construe the law. But they claim that WCA § 8 applies to a person convicted outside New York or New Jersey only if the individual involved serves the ILA in some capacity with influence over labor relations on the New York waterfront. All four of the ILA officials convicted in Florida, to whom the Commission has sent warning letters, serve in important ILA offices, having substantial power to affect labor relations on the New York waterfront.[30] The Commission has sought only to remove these individuals

§ 5–n(3)(b), N.Y.Laws § 9918(3)(b). The fact that petty larceny is sufficient under the statutes to disqualify a person from union duties suggests that the legislature was concerned more with the relationship of the crime to the waterfront than with the gravity of the offense.

**30.** Three of the four are, among other things, members of the ILA Executive Council, which has extensive powers over New York waterfront locals and membership. *See* ILA Const. art. VII, §§ 1, 5; art. IX, §§ 6, 8; art. X, §§ 1, 3; art. XI, §§ 1, 4; art. XII, §§ 2, 3, 4; art. XIII, § 10; art. XVI, § 10; art. XVIII, §§ 1(e), 2. The Fourth (Vanderwyde) is Special Organizer for the Atlantic Coast District, one of the plaintiffs in this case, which includes the New York waterfront. *Id.*, art. X, § 1(a).

from those offices; no effort has been made to change their status as officers in Florida locals. The New York courts seem likely to hold that convictions in any jurisdiction are adequate predicates for enforcement of WCA § 8, to the extent the individuals involved hold positions with significant influence over the New York waterfront. A more limited construction would permit union officials who hold high positions in the ILA to engage in or facilitate corrupt activities in New York, even though they have been found guilty of such activities in other jurisdictions.

Second, the full scope of "persons" to whom the dues collection prohibition aspect of WCA § 8 applies has not authoritatively been settled. No one claims, however, that the provision will not be construed to apply to employers who collect dues in a union's behalf. Similarly, that part of WCA § 8 that prohibits any "person" from knowingly allowing a disqualified person to continue in union office is likely to be construed as the Commission has treated it. The Commission in effect claims that, once it has given the union notice that one of its personnel is disqualified, the union's failure to remove that individual makes it subject to prosecution. Here, again, no party suggests another construction.

## V.  *FEDERAL AND CONSTITUTIONAL ISSUES*

Plaintiffs raise numerous federal and constitutional issues with respect to the enforcement of WCA § 8. The Commission and the State of New York urge that most, if not all, these claims have been settled by *De Veau v. Braisted, supra.* A review of

the factual and procedural history of *De Veau,* however, as well as of its reasoning, demonstrates it is not controlling on several substantial issues relating to pre-emption and freedom of association.

*De Veau* was an action by George De Veau in 1956 for a judgment declaring WCA § 8 invalid and enjoining its enforcement. At the time, WCA § 8 contained only the first of its three present prohibitions, the part that makes it illegal for any "person" to collect dues for a waterfront union employing someone convicted of certain crimes.[31] The ILA had discharged De Veau as Secretary-Treasurer of its Local 1346 when the Commission threatened to enforce the statute against anyone collecting dues while De Veau remained an ILA employee. Enforcement would necessarily have focussed entirely on De Veau's removal from office, since the statute contained no criminal or other penalty. De Veau sought reinstatement, and was joined by two union members claiming that De Veau's removal deprived them of their right to be represented by individuals of their choice. Thus, the central issues in *De Veau* were plaintiff's right to union employment, and the right of union members to employ him.

After losing in the state courts,[32] De Veau appealed to the Supreme Court, where he presented several substantive issues, all of which related to his exclusion from waterfront employment. He claimed that New York could not lawfully enforce WCA § 8, even directly against convicted persons such as himself, for holding water-

---

**31.** As first enacted in New York in 1953 (L.1953, c. 882, § 8), WCA § 8 only contained prohibitory provisions dealing with the collection of funds by a union. In 1969, the New York Legislature amended WCA § 8 (L.1969, c. 951 § 1) by adding provisions which prohibit persons who are convicted of certain crimes from holding union office and which prohibit unions and other "persons" from knowingly permitting said persons from holding office. In addition, WCA § 8 was further amended in 1969 to provide that violation of any provision of WCA § 8 is a misdemeanor punishable by fine of up to $500, imprisonment up to one year or both.

**32.** The state trial court denied relief and dismissed De Veau's complaint, holding, *inter alia,* that, although Congress guaranteed employees the right to bargain through representatives of their choice, it had not precluded New York from adopting a statute such as WCA § 8. 11 Misc.2d 661, 166 N.Y.S.2d 751 (Sup.Ct.1957). The state appellate courts upheld that decision unanimously. 5 A.D.2d 603, 174 N.Y.S.2d 596 (2d Dep't 1958) and 5 N.Y.2d 236, 183 N.Y.S.2d 793, 157 N.E.2d 165 (1959).

front union office. The legality of enforcing the dues-collection enforcement mechanism against others was not presented. The Court held that WCA § 8 had in principle been approved by Congress; that it was not pre-empted by Section 504(a) of the LMRDA; and that its application to De Veau was not a violation of his right to work, of due process, or of the ex-post-facto and bill-of-attainder clauses of the Constitution.

Significantly, the Court expressed no view on several of the pre-emption issues raised by plaintiffs in this case, including the legality of the Commission's construction of when a "conviction" occurs, or of its determination that a violation of LMRDA § 302 is a misdemeanor involving moral turpitude. Nor did the Court discuss whether WCA § 8, as then written, violated or could be applied so as to violate union members' freedom of association. Finally, although the Court in *De Veau* upheld WCA § 8 at a time when it contained only the dues-collection prohibition, the Court did not determine whether WCA § 8 was pre-empted insofar as it was intended to be applied against the union or employers; the Court dealt only with whether WCA § 8's disqualification of certain convicted persons violated their rights or the rights of other union members.

### A. Pre-emption of WCA § 8's Provisions

A fair analysis of the Supreme Court's opinion in *De Veau* requires that the lower federal courts accept as valid WCA § 8's basic objective of preventing "convicted" persons from serving in waterfront union positions. Nevertheless, whether the pre-emption claims not specifically addressed in *De Veau* are valid remains a difficult inquiry, depending on a balancing of state and federal interests. As Justice Frankfurter noted in *De Veau*, "[t]he doctrine of pre-emption does not present a problem in physics but one of adjustment because of the interdependence of federal and state interests and of the interaction of federal and state powers." 363 U.S. at 152, 80 S.Ct. at 1151.

The decisions concerning federal labor law pre-emption offer few, if any, hard-and-fast rules for effecting . that adjustment. In *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 245, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959), the Supreme Court attempted to set forth a workable rule whereby state regulation of any activity that is "arguably protected" or "arguably prohibited" by the NLRA would be pre-empted. Almost from the outset that rule has been qualified and modified. Perhaps recognizing that the exceptions had become too prevalent to ignore, the .Court recently rejected a "literal, mechanical" application of the *Garmon* rule, *Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters*, 436 U.S. 180, 188–89, 98 S.Ct. 1745, 1752–53, 56 L.Ed.2d 209 (1978), opting for "a balanced inquiry into such factors as the nature of the federal and state interests in regulation and the potential for interference with federal regulation." *Farmer v. United Brotherhood of Carpenters & Joiners of America, Local 25*, 430 U.S. 290, 300, 97 S.Ct. 1056, 1063, 51 L.Ed.2d 338 (1976). *See* Benke, *The Apparent Reformulation of Garmon: Its Effect on the Federal Preemption of Concerted Trespassory Union Activity*, 9 U.Toledo L.Rev. 793, 801–07 (1978). *See generally* Case Note, "*Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters*," 64 Cornell L.Rev. 595, 603 (1979). More specifically where as here Congress' interest as to pre-emptive effect is unclear, the pre-emption question appears to turn on an evaluation of three factors: (1) the degree to which the state or local law interferes with federal labor policy; (2) whether Congress has evidenced any willingness or unwillingness to tolerate the interference involved or analogous activities; and (3) the extent to which the matter regulated involves important state interests, or relates to an area traditionally of local concern.

In *De Veau*, the Court considered all three factors in upholding De Veau's disqualification under WCA § 8. First, the Court found only a minimal interference with federal labor policy guaranteeing the

right to bargain collectively through democratically chosen representatives, as expressed in NLRA §§ 1 and 7. The Court reasoned that WCA § 8 placed only a limited restriction on the right of waterfront employees to choose their representatives; they could still choose anyone except those ex-felons who had received a pardon or a "good conduct" certificate. 363 U.S. at 152, 80 S.Ct. at 1151.

Second, the Court found no "congressional purpose incompatible with the very narrow and historically explained restrictions upon the choice of a bargaining representative embodied in § 8 . . . ." *Id.* at 153, 80 S.Ct. at 1151. Congress had "unambiguously supported what is at the core of [the] reform." *Id.* And, the Court noted, WCA § 8 provides "the same kind of regulation as is contained in the compact: it effectively disqualifies exfelons from waterfront office, just as the compact makes prior conviction of certain felonies a bar to waterfront employment . . . ." *Id.* at 153–54, 80 S.Ct. at 1151. Moreover, despite objections voiced during subcommittee hearings that WCA § 8 unduly interfered with federal labor policy, Congress expressly gave its consent to the "implementing legislation not formally part of the compact." *Id.* at 154, 80 S.Ct. at 1152.

Finally, in distinguishing *Hill v. Florida,* 325 U.S. 538, 65 S.Ct. 1373, 89 L.Ed. 1782 (1945), the Court recognized that WCA § 8 sought to regulate a matter traditionally of local concern. Not only had Congress approved "the heart of the state legislative program" considered in *De Veau,* the challenged state legislation was part of a program "to vindicate a legitimate and compelling state interest, namely, the interest in combatting local crime infesting a particular industry." *Id.* 363 U.S. at 155, 80 S.Ct. at 1152. Presumably, the Florida legislation struck down in *Hill* went beyond what might have been necessary to combat local crime by union agents.

The Court also rejected De Veau's argument that WCA § 8 conflicts with § 504(a) of the LMRDA, adopted in 1959. Although it recognized that both provisions regulated the same area, it found no material significance in the fact that WCA § 8, by prohibiting union service for a greater number and variety of crimes and for a potentially indefinite period, is more restrictive than § 504(a). In fact, the similarity in the regulations "is surely evidence that Congress does not view such a restriction as incompatible with its labor policies." *Id.* at 156, 80 S.Ct. at 1152. Furthermore, the Court noted that, while Congress had expressly provided for pre-emption in some sections of the LMRDA, in LMRDA §§ 603(a) and 604, 29 U.S.C. §§ 523(a), 524 (1979), it expressly negated any intention to limit a state's authority over its criminal laws and over union officers. *Id.* at 157, 80 S.Ct. at 1153.

Applying the rulings and analysis of *De Veau* to this case, only three of plaintiffs' pre-emption arguments deserve discussion; only one has merit.

### 1. Pre-emption Based on LMRDA § 401

Although the Court in *De Veau* rejected the argument that WCA § 8 conflicts with LMRDA § 504, plaintiffs seek to avoid the effect of that ruling by urging the same result on the basis of LMRDA § 401(e), 29 U.S.C. § 481(e). LMRDA § 504 makes eligible for union office all members in good standing "subject to section 504 of this title and to reasonable qualifications uniformly imposed . . . .," and expressly protects the union members' right to vote for such candidates "without being subject to penalty, discipline, or improper interference or reprisal of any kind" by the union.[33] This

---

33. Section 401(e), 29 U.S.C. § 481(e), reads in relevant part:

    (e) In any election required by this section which is to be held by secret ballot a reasonable opportunity shall be given for the nomination of candidates and every member in good standing shall be eligible to be a candidate and to hold office (subject to section 504 of this title and to reasonable qualifications uniformly imposed) and shall have the right to vote for or otherwise support the candidate or candidates of his choice, without being subject to penalty, discipline, or improper interference or reprisal of any kind by such

provision, plaintiffs contend, places them "between Scylla and Charybdis;" they must choose between violating the WCA, with its criminal sanctions and/or economically destructive loss of income, and violating the mandate of Congress, with its attendant civil liability.

Nothing in plaintiffs' present contentions undercuts the Supreme Court's reasoning in rejecting De Veau's argument that WCA § 8 was pre-empted by LMRDA § 504. True, the Court in *De Veau* did not expressly deal with LMRDA § 401, but only because it was not argued as a basis for pre-emption. Had it been pressed, there is no reasoned basis for supposing that the Court's pre-emption analysis would have changed.

■ Contrary to what plaintiffs contend, WCA § 8 can be reconciled with LMRDA § 401. Section 401(e) prohibits *unions* from improperly interfering with the election of candidates as defined in that section; it does not prohibit unions from complying in good faith with additional eligibility requirements imposed by the *States*. The LMRDA was adopted in large part because state and local authorities had failed to adopt "effective measures to stamp out crime and corruption [in unions] and guarantee internal union democracy . . . ." Sen.Rep. No. 187, 86th Cong., 1st Sess., April 14, 1959, p. 6. U.S.Code Cong. & Admin.News, p. 2322 (1959). Consistent with this legislative purpose, Congress could reasonably allow a state to adopt more restrictive eligibility requirements, but at the same time refuse to permit a union to interfere with internal democracy.

■ That LMRDA § 401 does not preempt disqualification of waterfront union officers under WCA § 8 is supported by the

Second Circuit's decision in *Fitzgerald v. Catherwood*, 388 F.2d 400, 404 (2d Cir. 1968). The Second Circuit there upheld New York Labor Law § 723, which makes it a misdemeanor for any union officer to hold a financial interest in an employer whose employees are represented by the same union. Writing for the Court, Judge Kaufman found no conflict between the federal statute, LMRDA § 501, 29 U.S.C. § 501, and the state statute, since both placed union officers under similar fiduciary duties. The state law "merely imposes an [additional] remedy [criminal prosecution], for behavior that lies within the scope of the federal act." 388 F.2d at 405. Furthermore, noting that *De Veau* had described LMRDA § 603(a) as " 'an express disclaimer of pre-emption of state laws regulating the responsibilities of union officials,' " but carrying the analysis further, Judge Kaufman found no congressional intent in LMRDA §§ 401(e), 403, or 504(a), 29 U.S.C. §§ 481(e), 483, 504(a), to preclude state laws that imposed additional fiduciary duties on union officials, and that enforced those duties by criminal sanctions. Citing the LMRDA's legislative history, he noted that with respect to the fiduciary obligations of union officers Congress "sought to establish a federal minimum norm and did not intend to reduce or interfere with obligations imposed by state law." 388 F.2d at 405.

The enforcement of WCA § 8 against individual "convicted" officers no more frustrates the purpose of LMRDA § 401 than New York Labor Law § 723 was found to frustrate the LMRDA in *Fitzgerald*. Like § 723, WCA § 8 extends a pattern of regulation that Congress itself adopted in LMRDA § 504, in an area where Congress recognized a special need for supplementary legislation.[34]

organization or any member thereof. . . The election shall be conducted in accordance with the constitution and bylaws of such organization insofar as they are not inconsistent with the provisions of this subchapter.

34. Plaintiffs argue, however, that LMRDA §§ 401 and 504, viewed together, limit the manner in which elections may be conducted, and

that in contrast with LMRDA provisions governing fiduciary obligations, Congress intended to pre-empt state law in this area. As plaintiffs note, LMRDA § 403, 29 U.S.C. § 483, provides that

[n]o labor organization shall be required by law to conduct elections of officers with greater frequency or in a different form or manner than is required by its own constitu-

### 2. Pre-emption Based on LMRDA § 504 and ERISA § 411

■ Plaintiffs contend that Congress' definition of "convicted" in LMRDA § 504(c) and ERISA § 411(c)(1), 29 U.S.C. § 1111(c)(1), must be given controlling force over the inconsistent construction that New York and New Jersey are likely to give that term in WCA § 8. As noted above, both federal statutes expressly deem union officers "convicted" upon unsuccessful exhaustion of all appeals to which they are entitled. But the mere fact that Congress has twice adopted such a policy is insufficient under traditional pre-emption analysis to foreclose a state from adopting a more restrictive policy.

A rule that permits removal of union officers upon a guilty verdict, or upon sentence, interferes only marginally with federal labor policy. If under *De Veau* New York may lawfully prohibit some convicted persons from serving as union officials even though federal law would allow them to serve, it follows that New York should be permitted to remove "convicted" officers a few months sooner than federal law mandates. Granted, some degree of increased interference with the right to choose representatives will arguably occur because some convictions are overturned on appeal. But the potential for interference must be evaluated in light of the fact that conviction reversals are rare.[35] Furthermore, reversals do not necessarily reflect that the individual removed from office was unjustly accused or found guilty; they frequently result from procedural errors having little, if anything, to do with the accused's guilt, and often lead to retrials and reconvictions. Finally, nothing in WCA § 8 prevents a union from holding open the office of a convicted official until his appeals are final, or from reinstating him if his appeal succeeds.

■ Second, as the reasoning in *De Veau* makes plain, Congress manifested a willingness to tolerate more stringent regulation of waterfront union officials than for union officials generally. During Congressional hearings concerning the Compact's approval, an extensive record of blatant corruption and criminality in the ILA leadership was compiled, demonstrating an "[u]rgent need for drastic reform." *De Veau v. Braisted, supra,* 363 U.S. at 147, 80 S.Ct. at 1148. *See generally* S. Interim Rep. No. 653, 83d Cong., 1st Sess. (1953). Even the AFL–CIO, through its President, George Meany, recommended extraordinary measures to remove convicted persons from ILA offices. *See* Hearing on H.R. 6286, H.R. 6321, H.R. 6343, and S. 2383, before Subcomm. No. 3 of the House Comm. on the Judiciary, 83d Cong., 1st Sess. 132 (1953). In light of the special circumstances presented by waterfront union corruption, and given Congress' unique response approving the Compact with its enabling

---

tion or bylaws, except as otherwise provided by this subchapter. . . .

That Congress in LMRDA § 403 intended to pre-empt state laws regulating the "form or manner" of union elections in no way undermines the Supreme Court's conclusion in *De Veau* that the "express disclaimer of pre-emption" in LMRDA § 603 applies to the disqualification of union officers under WCA § 8. In drafting LMRDA § 403, it appears that Congress was concerned not with the identity of the candidate but rather with the procedural aspects of union elections. In discussing the section's legislative history, the court stated in *Fitzgerald v. Catherwood, supra,* 388 F.2d at 404:

Congress was obviously concerned not to make it unduly burdensome or even impossible for unions functioning in several states to comply with a myriad of conflicting election laws. S.Rep. No. 187, 86th Cong., 1st Sess.

at 21–22 (1959). The focus of attention was on the need to have uniform rules governing the procedural aspects of union elections. Thus, the Senate committee report cited as an example of its concern the undesirability of having too frequent elections for this could result in instability in collective bargaining relationships with employers.

**35.** Plaintiffs note one current instance where the conviction of an ILA official for an offense covered by WCA § 8 has been reversed. *United States v. Dixon,* 609 F.2d 827 (5th Cir. 1980) cited in Gleason Aff., Jan. 23, 1980, ¶ 16(b). But, during fiscal year 1979, only 10.4 percent of the criminal convictions in federal courts were reversed. *1979 Annual Report of the Director of the Administrative Office of the United States* at 207.

clause, it seems clear that Congress would tolerate if not commend WCA § 8's requirement that union officers resign or be removed before appeals are final, even though it is a departure from the federal rule.

■ Finally, the special rule of WCA § 8 regarding when a conviction occurs is a valid exercise of state police power in an area of traditional local concern. The corruption prevailing on the New York waterfront made prompt removal of convicted officials highly desirable, particularly since those officials often controlled or influenced the use of union dues. To the extent that removal before appeal was designed to protect union dues from fraudulent misuse and self-dealing, the statute manifests a reasonable exercise of the state's police power, which is entitled to at least the same degree of deference the *De Veau* Court accorded to that aspect of WCA § 8 that goes beyond federal law in establishing potentially perpetual disqualifications from union office.

### 3. *Pre-emption Based on Overbroad Regulation*

Preliminary relief was granted in this case because WCA § 8, on its face, goes beyond prohibiting convicted persons from being employed by waterfront unions. No doubt § 8's principal objective was and is to get convicted persons out of waterfront union positions. Valid though this objective is, it must be attained through permissible means.

■ WCA § 8 has three separate prohibitions. Its most direct prohibition—aimed at convicted employees—is clearly valid. Furthermore, its prohibition dealing with dues collection is likewise valid insofar as it is enforced against ineligible employees who handle dues, such as George De Veau. The sanction of WCA § 8 aimed at unions or union officers who knowingly permit an ineligible employee to assume or hold office raises serious questions, but it cannot be deemed invalid in all circumstances. Finally, the threatened enforcement of the dues-collection prohibition against unions and employers is unlawful.

### a. *Enforcement against Unions or Officers for Knowingly Permitting Prohibited Employment*

■ Enforcement of a criminal statute against a union or union officer for permitting a duly elected union official to continue in office potentially involves substantial interference with federal labor policy. Unlike WCA § 8's disqualification of convicted felons, which *De Veau* found a "very narrow and historically explained" restriction on the choice of a bargaining representative, 363 U.S. at 153, 80 S.Ct. at 1151, the provision of WCA § 8 that authorizes prosecution of unions or officials for knowingly permitting disqualified persons to be employed can substantially interfere with labor relations. Convicting a union would, first, prejudice innocent members, albeit to a limited extent, since the penalty is small. More significantly, WCA § 8 leaves unclear when a union or officer will be deemed "knowingly" to have permitted outlawed employment. It may well be enough that the Commission notify the union or officer involved of its view that a certain employee is disqualified by reason of some conviction. But an employee might deny the conviction, or claim that the conviction is not disqualifying under the statute. To allow a criminal prosecution of a union or officer, in such a context, might be questionable in terms of both labor policy and elemental fairness. On the other hand, one can imagine situations where a union or officer cooperates with a disqualified individual though well aware that the individual is in fact ineligible. Prohibiting conduct wilfully designed to enable disqualified persons to continue in power seems consistent with the federal labor policy against permitting such persons to hold positions of authority in unions.

Little evidence exists in the history of the WCA as to how Congress would have viewed the WCA § 8 provision threatening unions and officers with prosecution as a means of securing the removal of disqualified union employees. But, a few years after the Compact was adopted, Congress enacted an almost identical remedial meas-

ure in the LMRDA, imposing criminal penalties of up to $10,000 and one year imprisonment against any "labor organization or officer thereof" who "knowingly permit[s] any person to assume or hold any office or paid position in violation of" LMRDA § 504, 29 U.S.C. 504(a) and (b). This provision was adopted, moreover, after legislative changes and debate reflecting the belief of leading legislators that providing a sanction against unions and union officers was necessary despite the argument that, as a practical matter, direct enforcement against the disqualified employee would suffice.[36]

In light of LMRDA § 504, and its background, it cannot be said that Congress views all sanctions against unions and union officers "as incompatible with its labor policies." *De Veau v. Braisted, supra,* 363 U.S. at 156, 80 S.Ct. at 1152. LMRDA § 504 evidences Congress' approval of criminal sanctions against a union or its officers, at least where proceedings directly against the convicted official prove unavailing in obtaining that employee's removal, and where the union or union official permits the ineligible employee to continue and knows of his ineligibility. But whether Congress intended to allow prosecutions against a union or union officer before an attempt is made to remove the ineligible employee through a direct criminal prosecution is unclear, since little evidence exists to support Congress' approval of the unnecessary use of this indirect remedy.

The fact that Congress in the LMRDA perceived a need for a remedy against unions and their officers supports the reasonableness of the New York legislature's conclusion ten years later that circumstances on the waterfront might also necessitate use of such an indirect remedy. When corruption so pervades a union's leadership that its officers knowingly permit a disqualified employee to remain in union office, the justification for even an indirect sanction under the police power becomes great. But absent a record of such corruption, and a showing that direct enforcement against the disqualified employee is inadequate to advance the state and local interest, the justification for pursuing the indirect remedy is unclear.

For these reasons, plaintiffs' claim that federal labor law pre-empts WCA § 8's sanction against unions or union officers is

---

**36.** Only the Kennedy-Ervin bill introduced in the Senate provided for criminal sanctions against the union and its officers for "knowingly permitting" a convicted official to retain his office. S. 1555, as passed, 86th Cong., 1st Sess. § 405(b) (1959). The Senate bill only permitted such sanctions where the union or officer knowingly permits an official convicted of the LMRDA's various reporting and trusteeship provisions to hold office. Senator Goldwater's statements suggest that, in providing for sanctions against the union and its officers, the legislators were concerned that certain corrupt labor leaders had successfully maintained their hold on union activities even while they were in prison. Cong.Rec. 10957–8, Senate, June 12, 1958. In response to these concerns, then Senator John Kennedy, a sponsor of the bill, stated that in most cases the disqualified official would "as a practical matter" resign from office to avoid prosecution, and that subjecting the union to a fine if it continued an offending official in office would afford the kind of protection Senator Goldwater sought. *Id.*

Apparently, the limited enforcement measures ultimately adopted for proceeding against the union and its officers were controversial. The Landrum-Griffin bill in the House did not provide for such indirect enforcement measures.

*See* H.R. 8342, as reported, 86th Cong., 1st Sess. § 504 (1959). Furthermore, it appears that in the Senate Subcommittee, the majority wanted to limit these sanctions to hold only the union officers, and not the union itself, responsible for permitting disqualified persons to hold office or employment. Cong.Rec. 19767, Senate, (Sept. 14, 1959) (statement of Barry Goldwater). However, as a result of the minority's "vigorous objection," the sanctions against both the union and union officers were retained. *Id.*

The Senate bill was ultimately amended in conference to provide the same sanctions against the union and union officers for knowingly retaining an employee disqualified because of his conviction of a serious crime now enumerated in under LMRDA § 504. *See* Cong.Rec. 19767, Senate, Sept. 14, 1959. As Senator Goldwater had argued, such an amendment was necessary to eliminate the "strange paradox that a union or its officers commit a crime if they permit a person to hold office who has failed to comply with the reporting requirements of the bill . . . but imposes no penalty of any kind on a union or its officers permitting a convicted felon, even one guilty of murder, arson, or rape, to hold union office." Cong.Rec. 10102, Senate, June 8, 1959.

rejected. It is a sanction that is valid on its face, in that circumstances are readily conceivable in which its application would advance the legislative purposes of both Congress and New York. No doubt, this provision of WCA § 8 could be applied so as to interfere with federal labor policy, in contexts where Congress has not clearly approved its use, and where its invocation is unnecessary to achieve any important local interest. But that question should be addressed only after the Commission and the State of New York have considered further how and on what basis they intend to utilize this sanction.

### b. *Enforcement of the Dues-Collection Prohibition*

■■■ Prosecutions or threatened prosecutions against unions and ·employers for collecting dues would work a substantial interference with federal labor policy. By preventing the collection of dues by any person, including the union or an employer, WCA § 8 has the practical effect of limiting, if not destroying, the ability of a union to advance the collective goals of its membership. No remedy could go more directly to the heart of a union's strength. If a union stopped collecting dues to avoid being prosecuted for retaining an employee claimed to be ineligible, the membership could suffer significantly, in that their joint activities would be threatened. Furthermore, far from promoting industrial peace and harmony, such prosecutions might well have the effect of pitting worker against employer. If an employer ceased transmitting dues to avoid violating WCA § 8, it could, as the employers have contended, soon face a crisis with its employees, who might well protest an interference with what they regard as a contractual right. The resulting industrial strife and unrest would ultimately "impair the interest of the public in the free flow of . . . commerce." 29 U.S.C. § 151.

Indeed, the degree of interference with a union's ability to function is analogous to the level of interference identified in *Hill v. Florida*, 325 U.S. 538, 65 S.Ct. 1373, 89 L.Ed.

1782 (1945). In that case, not only did the state statute impose on unions certain reporting procedures not required by the NLRA, but in enforcing that statute the state enjoined the union from functioning as a labor organization under the NLRA. *Fitzgerald v. Catherwood, supra*, 388 F.2d at 406 n. 7. In discussing the use of injunctive relief, the Court in *Hill* stated (325 U.S. at 543, 65 S.Ct. at 1375):

The requirement as to the filing of information and the payment of a $1.00 annual fee does not, in and of itself, conflict with the Federal Act. But, for failure to comply, this union has been enjoined from functioning as a labor union. It could not without violating the injunction and also subjecting itself to the possibility of criminal punishment even attempt to bargain to settle a controversy or a strike. It is the sanction here imposed, and not the duty to report, which brings about a situation inconsistent with the federally protected process of collective bargaining. Cf. *Western Union Co. v. Massachusetts*, 125 U.S. 530, 553, 554 [, 8 S.Ct. 961, 965, 966, 31 L.Ed. 790]; *Kansas City Southern R. Co. v. Kaw Valley Drainage District*, 233 U.S. 75, 78 [, 34 S.Ct. 564, 565, 58 L.Ed. 857]; *St. Louis S. W. R. Co. v. Arkansas*, 235 U.S. 350, 368 [, 35 S.Ct. 99, 104, 59 L.Ed. 265]. This is true because if the union or its representatives acted as bargaining agents without making the required reports, presumably they would be liable both to punishment for contempt of court and to conviction under the misdemeanor section of the act. Such an obstacle to collective bargaining cannot be created consistently with the Federal Act.

Similarly, in this case, disqualification of convicted persons is proper. But seeking this end through a sanction .aimed at effecting a dues cut-off unduly interferes with a waterfront worker's federally protected right to engage in collective activity. While *De Veau* makes clear that a state may, under the proper circumstances, limit a worker's right to choose a particular union representative, it in no way suggests that a state could deprive workers of all

representation. As a practical matter, a dues cut-off could have this result, among other equally unacceptable consequences.

Furthermore, the other arguments marshalled in *De Veau* to uphold disqualification under WCA § 8 cannot be made to support criminal enforcement of the dues-collection prohibition against persons other than disqualified employees, such as De Veau himself. In *De Veau* Justice Frankfurter relied in part on the similarity of WCA § 8 to the provisions of the Compact itself. He further reasoned that there was no "sensible reason to suppose that Congress would approve the major part of the local effort . . . and disapprove its application to union officials who, as history proved, had emerged as a powerful and corrupting influence on the waterfront second to none . . . ." 363 U.S. at 154, 80 S.Ct. at 1151. In contrast, nothing in the Compact's licensing scheme, which provides for various disqualifications, suggests that Congress implicitly approved an indirect enforcement mechanism like the dues-collection prohibition. In upholding De Veau's disqualification, moreover, Justice Frankfurter could not have passed upon the propriety of a criminal sanction, since WCA § 8 included no such penalty at the time.

Nor can tacit approval of the Commission's position be gleaned from Congress' own enactments. As already noted, the enforcement measures of LMRDA § 504 are limited to criminal prosecutions against the convicted official and the union or union officer who "knowingly permits" a violation of § 504. In fact, the legislative history of

the LMRDA indicates that in regulating unions Congress sought to interfere as little as possible with union affairs, and that direct remedies for violations were preferred. As the final Senate Report stated:

> Remedies for the abuses should be direct. Where the law prescribes standards, sanctions for their violation should also be direct. The committee rejects the notion of applying destructive sanctions to a union, i. e. to a group of working men and women, for an offense for which the officers are responsible and over which the members have, at best, only indirect control. Still more important the legislation should provide an administrative or judicial remedy appropriate for each specific problem.

Sen.Rep.No. 187, 86th Cong., 1st Sess., at 7, U.S.Code Cong. & Admin.News 1959, at 2323 (April 14, 1959).

While the LMRDA does not preclude state participation in raising the fiduciary standards of union officers, *see* 29 U.S.C. § 523(a),[37] and specifically disclaims any intent "to impair or diminish the authority of any State to enact and enforce general criminal laws . . . ," 29 U.S.C. § 524,[38] the legislative history indicates that Congress was unwilling to permit states to use their criminal laws to interfere improperly with internal union affairs or functions. LMRDA § 524 was amended, in fact, to make clear that Congress had no intention to approve state laws inconsistent with specific provisions of the LMRDA merely because the laws were enacted as criminal statutes.[39] To the extent WCA § 8 is ap-

---

**37.** LMRDA § 603(a), 29 U.S.C. § 523(a), reads in full:

> Except as explicitly provided to the contrary, nothing in this chapter shall reduce or limit the responsibilities of any labor organization or any officer, agent, shop steward, or other representative of a labor organization, or of any trust in which a labor organization is interested, under any other Federal law or under the laws of any State, and, except as explicitly provided to the contrary, nothing in this chapter shall take away any right or bar any remedy to which members of a labor organization are entitled under such other Federal law or law of any State.

**38.** LMRDA § 604, 29 U.S.C. § 524, reads in full:

> Nothing in this chapter shall be construed to impair or diminish the authority of any State to enact and enforce general criminal laws with respect to robbery, bribery, extortion, embezzlement, grand larceny, burglary, arson, violation of narcotics laws, murder, rape, assault with intent to kill, or assault which inflicts grievous bodily injury, or conspiracy to commit any of such crimes.

**39.** The Senate's original version of LMRDA § 604 had simply provided that "[n]othing in the Act shall be construed to impair or diminish the authority of any State . . . to enact or enforce its own criminal laws." S.

plied directly against persons improperly holding union positions it is consistent with the LMRDA's design and provisions. Thus applied, it represents a conventional exercise by New York of its police powers to prevent a presumably untrustworthy person from exercising powers in matters important to the public as well as to unionists. When, however, WCA § 8 is utilized against unions and employers to achieve indirectly the permissible end of removing persons improperly holding union positions, and when in the process the regular flow of union dues is thereby threatened, the statute represents a strikingly unconventional use by a state of its criminal laws,[40] and conflicts with important premises of the federal labor laws, a result condemned by the Compact itself, N.Y.Laws § 9869.

Finally, the record in this case fails to demonstrate that enforcement of WCA § 8's dues-collection prohibition is necessary for effective exercise of the state's police power. Although New York has a substantial interest in ridding its waterfront unions of ex-felons, it has no interest in doing so through overbroad enforcement mechanisms. No instance has been identified in which an offending employee has held on to his job in the face of imminent criminal prosecution. Furthermore, if an ineligible employee refuses to resign despite prosecution, the Commission and the State may proceed against the union or a union officer who knowingly enables him to continue in office. Only where both these sanctions fail could it be said that use of the dues-collection prohibition against a union or em-

1555, as reported, 86th Cong., 1st Sess., § 507 (1959). The purpose of that provision was to make clear that neither the LMRDA section making embezzlement of union funds a federal crime nor LMRDA § 504's enumeration of serious crimes was intended to bar the states from exercising their general police powers. S.Rep.No. 186, 86th Cong., 1st Sess. 54 (1959). However, fearful that the reference to state criminal laws was too broad, Senator Morse proposed to amend the original draft to specify the "general criminal laws" that Congress did not intend to pre-empt. As he explained:

> [w]ithout the amendment [now LMRDA § 604] it might be possible to argue that any State statute dealing with matters specifically covered in the bill—such as the provisions limiting the tours of office of union officers— would be valid if enacted as a criminal statute. 105 Cong.Rec. 5991 (daily ed. April 24, 1959).

Senator Morse's proposed amendment was immediately accepted without discussion.

The Second Circuit in *Fitzgerald v. Catherwood, supra*, 388 F.2d at 405, construed Senator Morse's remarks so as not to preclude the use of criminal sanctions in enforcing state laws governing the fiduciary duties of union officers. But criminal sanctions against potentially innocent third parties for violation of WCA § 8's dues-collection prohibition falls well outside the scope of either traditional criminal or fiduciary laws.

**40.** Justice Frankfurter's opinion in *De Veau* stated that, in approving the Compact, Congress was "fully mindful" of WCA § 8 as then enacted. 363 U.S. at 151, 80 S.Ct. at 1150. But the legislative history on this issue is at best equivocal; Section 8 was never before Congress for approval. And, although Congress may, in fact, have approved the core of the

statute—the disqualification of union officials—there is no indication whatsoever that Congress gave any meaningful consideration to the details of the statute. Indeed, WCA § 8, as presented to Congress during its consideration of the Compact, did not provide for any penalty—civil or criminal—for violation of its dues-collection prohibition. It was not until 1969 that the New York legislature amended WCA § 8 to provide that a violation of its provisions is a misdemeanor punishable by fine of up to $500 and/or up to one year imprisonment. See note 31, *supra*. Thus the Court in *De Veau* did not address the propriety of imposing criminal sanctions against a union or an employer for violation of the dues-collection prohibition, the issue squarely presented here. As the Appellate Division stated in its opinion in *De Veau*, "[t]he question as to whether violation of Section 8 is indeed a crime or offense, and whether respondent indeed could have prosecuted a violator of the section has not been raised and we do not pass on it." 174 N.Y.S.2d at 601. It was apparently sufficient for the state courts as well as the Supreme Court in *De Veau* that the defendant district attorney had, "through the power of his office," effectively forced De Veau's dismissal. *Id.* And, as noted above, only issues pertaining to the propriety of that dismissal were at bar. The Commission refers to Governor Rockefeller's memorandum approving passage of the 1969 amendment, where he wrote that the amendment was for the purpose of achieving WCA § 8's original intent that any violation of its provisions be a misdemeanor. Affidavit of Leonard Newman, Esq., pp. 8–9. The Governor's statement does not change what was before Justice Frankfurter when *De Veau* was decided.

ployer is necessary. No such situation has ever occurred, or seems likely to occur.

That some convicted officials have on occasion delayed their removal by seeking declaratory relief before criminal prosecutions could be commenced also fails to justify enforcement against unions and employers of the dues-collection prohibition. As this case demonstrates, resort to the courts for such relief is made more, not less, likely when WCA § 8 enforcement is indiscriminate, with unnecessary threats against unions and employers. Furthermore, if New York encountered unwarranted difficulty in enforcing WCA § 8 against ineligible individuals, it might well consider adopting the statutory modification enacted by New Jersey in Section 32:23–80.2, which permits the Commission to obtain in state court an order removing ineligible employees from office, without the delay of a criminal prosecution.[41] If in some rare situation enforcement of WCA § 8 against a union or employer for violating the dues-collection prohibition became necessary, further consideration of the pre-emption issue might be warranted. Until then, however, WCA § 8's enforcement should be limited to criminal actions against the convicted officials and, where appropriate, against the union or officer who permits him to remain in office.

The results reached in this case are consistent with the Supreme Court's approach in dealing with the comparably complex pre-emption issues that arise when libel actions are brought against unions. Striking a balance between a state's strong interest in protecting its citizens from malicious libel, and the important federal interest in encouraging vigorous debate in labor relations, the Supreme Court in *Linn v. United Plant Guard Workers*, 383 U.S. 53, 61, 86 S.Ct. 657, 662, 15 L.Ed.2d 582 (1966) imposed substantive limitations on the availability of state relief, holding that recovery be "limited to redressing libel issued with the knowledge of its falsity, or with reckless disregard of whether it was true or false." This "substantive restriction",

drawn by analogy from *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), was deemed necessary "to prevent unwarranted intrusion upon free discussion envisioned by the [National Labor Relations] Act." *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 272, 94 S.Ct. 2770, 2775, 41 L.Ed.2d 745 (1974). Furthermore, recognizing that damages sought in such state actions could "pose a threat to the stability of labor unions and small employers," the Court limited the availability of punitive damages, and emphasized that state trial courts have a "duty" to assure that damage awards are not excessive. *Linn v. United Plant Guard Workers, supra*, 383 U.S. at 64–66, 86 S.Ct. at 663–64. *Accord Farmer v. United Brotherhood of Carpenters & Joiners of America, Local 25*, 430 U.S. 290, 306, 97 S.Ct. 1056, 1066, 51 L.Ed.2d 338 (1977) (action for intentional infliction of emotional distress).

Here, as in the area of state libel actions, a strong state interest exists in permitting enforcement of laws designed to eliminate crime on the waterfront, but restraints are necessary to avoid unnecessary or excessive interference with federally protected labor activities. Under the "balanced approach" adopted here, the Commission and the State are free to prosecute disqualified officials; and under proper circumstances they may proceed against unions or union officers who "knowingly permit" such persons to continue their employment. They may not proceed, however, against employers and others for participating in dues collection or distribution, in light of the substantial disruption such prosecutorial authority might cause.

It might be argued that no aspect of WCA § 8's enforcement should be pre-empted, because the threat of enforcement against a union or employer is so great, and the consequences of noncompliance so drastic, that no union would permit an employee disqualified by WCA § 8 to remain on its payroll. But an improper interference with

---

**41.** See note 5, *supra*.

federal labor policy is no less invalid because it is likely to be effective. Furthermore, the assumption that WCA § 8 would never have to be enforced against unions or employers because the union would ultimately acquiesce is questionable. History is replete with instances where union leaders have permitted their organizations to sustain great injury to avoid complying with demands they oppose. Here, they may feel impelled to protect one of their own number to avoid retaliation or criticism from factions within the membership. As a result, the membership, including those willing to have a convicted official removed, could suffer the serious consequences flowing from a dues cut-off. In short, pre-emption is proper both in principle and as a practical measure, since one cannot possibly predict in the complex world of labor relations the consequences of WCA § 8's overbroad enforcement.

## B. Constitutional Issues

Plaintiffs also press a series of constitutional claims on behalf of the individuals whose removal from office is at issue. Only one claim has apparent merit.

Plaintiffs argue, first, that due process demands a determination that an officer is unfit before he can be removed from office and that the per se employment ban of WCA § 8 therefore violates the Fourteenth Amendment. In De Veau, the Supreme Court addressed, and rejected, a nearly identical challenge to the statute.[42] De Veau claimed that, without a factual determination that he was unfit for union employment, due process proscribed depriving him of his job on the basis of an inconsequential crime committed in his youth. Although the Court recognized that WCA § 8 might bar some officials from union employment who were in fact fit to serve, it refused to substitute its "judgment for that of Congress and the Legislatures of New York and New Jersey regarding the social surgery required by a situation as gangre-

nous as exposure of the New York waterfront had revealed." Furthermore, Justice Frankfurter noted that "[b]arring convicted felons from certain employment is a familiar legislative device to insure against corruption in specified vital areas. Federal law has frequently and of old utilized this type of disqualification." 363 U.S. at 158–59, 80 S.Ct. at 1154. Since the employment ban was a reasonable means for achieving a legitimate state aim, it did not violate due process. That determination by the Supreme Court controls here.

Plaintiffs' reliance on cases such as Cleveland Board of Education v. LaFleur, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974) and Vlandis v. Kline, 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973), in arguing that WCA § 8's ban on employment is an unconstitutional irrebuttable presumption, is unpersuasive. The Supreme Court itself has warned that extension of those holdings can "turn the doctrine of those cases into a virtual engine of destruction for countless legislative judgments which have heretofore been thought wholly consistent with the Fifth and Fourteenth Amendments to the Constitution." Weinberger v. Salfi, 422 U.S. 749, 772, 95 S.Ct. 2457, 2470, 45 L.Ed.2d 522 (1975). The point of De Veau is that the disqualification of certain convicted persons from waterfront union employment is reasonable. LaFleur and Vlandis cannot apply where the challenged legislative classification has been so upheld.

Plaintiffs argue, however, that waterfront conditions have improved since De Veau, and that as a result the empirical basis for the Supreme Court's conclusion as to the reasonableness of WCA § 8 is no longer valid. Undoubtedly conditions have changed "on the waterfront" since Marlon Brando's memorable portrayal; the findings of the New York State Crime Commission, and the Investigating Subcommittee on Interstate Commerce, paint a bleak picture of murderous thugs prowling the waterfront in the 1950's. But how signifi-

---

42. De Veau had the benefit of an amicus brief prepared by the American Civil Liberties Union by Nanette Dembitz and Edward L. Sadlowsky, which thoroughly argued the due process issue, and presented all the leading authorities.

cant the changes have been, and what regulatory adaptations are appropriate as a result, are decisions for the legislatures of New York and New Jersey. In fact, New Jersey saw fit to *expand* the scope of WCA § 8 in 1962, N.J.L.1963 c. 5, § 3 and § 5(8–b), despite the arguments of young union representative named Anthony Scotto, now among the several convicted officials seeking to avoid immediate removal. *See* Pub. Hearing on Assembly Bill No. 319 before New Jersey Assembly Committee on Labor and Industrial Relations, pp. 76A–81A, 111A–115A (April 28, 1961). And New York expanded the scope of WCA § 8 in 1961 and again in 1962. N.Y.L.1961 c. 211, § 3; N.Y.L.1969 c. 951 § 1. *See* note 31, *supra.* Although the nature of waterfront crime may have changed, enough of a problem continues to exist, as is evidenced by the number of convictions at issue in this action, to make wholly inappropriate judicial reexamination of the reasonableness of the legislation.

█ Plaintiffs also claim that WCA § 8 deprives the threatened officers of equal protection of the laws, since it singles out union officers from members of other professions, and waterfront unions from other labor organizations. The argument is meritless. The legislatures of New York and New Jersey may permissibly create special remedies for the special problems of the waterfront. And, as noted, *De Veau* established conclusively that the disqualification remedy was reasonably related to a legitimate state purpose. *See, e. g., Barry v. Barchi,* 443 U.S. 55, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979).

█ Plaintiffs' final, and most compelling argument, concerns enforcement of WCA § 8, not against the disqualified officials, but against the union membership, the union, and the employers' associations. They urge in particular that WCA § 8, through its dues collection prohibition, violates union members' First Amendment right to freedom of association. If correct, the ruling that enforcement of that prohibition is pre-empted by the federal labor laws dispenses with the need to reach this consti-

tutional question. Nevertheless, since the pre-emption issue is of first impression, and since the constitutional argument has been briefed and considered, it seems proper to explain why the provision appears constitutionally invalid as applied to unions and employers.

█ It is firmly established that "the right of association is a 'basic constitutional freedom' . . . that is 'closely allied to freedom of speech and a right which, like free speech, lies at the foundation of a free society. . . .'" *Buckley v. Valeo,* 424 U.S. 1, 25, 96 S.Ct. 612, 637, 46 L.Ed.2d 659 (1976), quoting *Kusper v. Pontikes,* 414 U.S. 51, 57, 94 S.Ct. 303, 307, 38 L.Ed.2d 260 (1973) and *Shelton v. Tucker,* 364 U.S. 479, 486, 81 S.Ct. 247, 251, 5 L.Ed.2d 231 (1960). "Nor can it be questioned that the First Amendment's protection of speech and associational rights extends to labor union activities." *Connecticut State Federation of Teachers v. Board of Education Members,* 538 F.2d 471, 478 (2d Cir. 1976). Thus, the right of association would seem to encompass the right of workers to join and organize unions for the purpose of pursuing common economic, social, and political goals. *See United Transportation Union v. State Bar of Michigan,* 401 U.S. 576, 91 S.Ct. 1076, 28 L.Ed.2d 339 (1971); *United Mine Workers v. Illinois Bar Ass'n.,* 389 U.S. 217, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967); *Brotherhood of Railroad Trainmen v. Virginia,* 377 U.S. 1, 5, 84 S.Ct. 1113, 1116, 12 L.Ed.2d 89 (1964); *Thomas v. Collins,* 323 U.S. 516, 531–32, 65 S.Ct. 315, 323, 89 L.Ed. 430 (1945); *Thornhill v. Alabama,* 310 U.S. 88, 102–03, 60 S.Ct. 736, 744, 84 L.Ed. 1093 (1940); *American Federation of State, County and Municipal Employees v. Woodward,* 406 F.2d 137, 139–40 (8th Cir. 1969).

█ WCA § 8's dues collection prohibition, when enforced against the union and employers' associations impinges upon these protected areas. Collection of dues is vital to the operation of a union; a prohibition of dues collection significantly curtails the union's capacity to function and to advance the collective goals of its membership, thereby significantly interfering with the

right of individual members freely to associate. Although the outer parameters of First Amendment protection for union activities remain undefined, the measures utilized by WCA § 8 impact well within the core area of protected activity. That WCA § 8 does not directly prohibit association, as would an express bar on union activities or union membership, is of no consequence. An indirect burden on the exercise of associational rights may be as invalid an interference as a direct prohibition of protected activity. As the Supreme Court has stated: "Freedoms such as these are protected not only against heavy-handed frontal attack, but also from being stiffled by more subtle governmental interference." *Bates v. Little Rock*, 361 U.S. 516, 523, 80 S.Ct. 412, 416, 4 L.Ed.2d 480 (1960). *See also Kusper v. Pontikes, supra,* 414 U.S. at 58, 94 S.Ct. at 308; *United Mine Workers v. Illinois Bar Ass'n.*, 389 U.S. 217, 222, 88 S.Ct. 353, 356, 19 L.Ed.2d 426 (1967).

The threat that WCA § 8 poses to the dues collection mechanism of waterfront employees works a governmental interference analogous to, and more compelling than, an interference invalidated by the Supreme Court in *Buckley v. Valeo, supra.* In that case, the Court considered, *inter alia,* the constitutionality of a limitation, imposed by the Federal Election Campaign Act of 1971, of $1000 per year on independent expenditures by individuals and

groups "relative to a clearly identified candidate." The Court stated that the limitation "precludes most associations from effectively amplifying the voice of their adherents, the original basis for the recognition of First Amendment protection of the freedom of association. . . . The Act's constraints on the ability of independent associations and candidate campaign organizations to expend resources on political expression 'is simultaneously an interference with the freedom of [their] adherents.' " 424 U.S. at 22, 96 S.Ct. at 636 (citations omitted). That reasoning is particularly apposite where, as here, the ultimate effect of the restraint is not merely to limit, but to curtail, absolutely, the collection, and to that extent the expenditure, of union funds.[43]

In light of its intrusion on protected activities, WCA § 8 must bear a substantial burden of justification. The Supreme Court in *De Veau* may be said to have definitively found a substantial if not compelling need for New York and New Jersey to combat waterfront crime .and union corruption. *Compare Bates v. Little Rock, supra,* 361 U.S. at 524, 80 S.Ct. at 417. But even this finding would only justify legislation that is narrowly drawn to accomplish the established need. "Precision of regulation must be the touchstone in an area so closely touching our most precious free-

---

**43.** The absolute nature of WCA § 8's prohibition distinguishes this case from those cases in which government employers have granted dues-check-off privileges to majority unions, while denying similar privileges to minority unions. *E. g., Connecticut State Federation of Teachers v. Board of Education Members, supra,* 538 F.2d at 482; *Local 858 of A. F. T. v. School District No. 1 in the County of Denver,* 314 F.Supp. 1069 (D.Colo.1970); *Bauch v. City of New York,* 21 N.Y.2d 599, 289 N.Y.S.2d 951, 237 N.E.2d 211, *cert. denied,* 393 U.S. 834, 89 S.Ct. 108, 21 L.Ed.2d 105 (1968). In those cases, the courts rejected the argument of minority unions that the government employer's refusal to accord them dues-check-off privileges impinged on union members' right of association. But in so holding, the courts have indicated that an absolute proscription of dues collection would require a different result. As the New York Court of Appeals stated in the leading case:

The petitioners also argue that the withdrawal of the dues-check-off will weaken their minority union to the point of threatening its very existence. They will then be deprived, they assert—pointing to such decisions as *Bates v. City of Little Rock,* 361 U.S. 516 [, 80 S.Ct. 412, 4 L.Ed.2d 480] . . ., *NAACP v. State of Alabama* . . . and *Thomas v. Collins* . . . of their right of freedom of association guaranteed by the First and Fourteenth Amendments of the Federal Constitution . . . . Nothing in the city's labor policy denies members of the petitioners' union the right to meet, to speak, to publish, to proselytize and *to collect dues by means employed by thousands of organizations of all kinds, that do not have the benefit of a dues-check-off.* . . .

*Bauch v. City of New York, supra,* 289 N.Y. S.2d at 956, 237 N.E.2d at 216 (emphasis added). *See also Local 858 of A. F. T. v. School District No. 1, supra,* 314 F.Supp. at 1076–77.

**1134**

doms." *NAACP v. Button*, 371 U.S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed.2d 405 (1963). "[E]ven though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgment must be viewed in the light of less drastic means for achieving the same basic purpose." *Shelton v. Tucker, supra,* 364 U.S. at 488, 81 S.Ct. at 252.

When applied against the union and union employers, in the first instance, to force removal of a convicted officer, the dues-collection mechanism of WCA § 8 seems unconstitutional; "less drastic means" appear readily available to achieve the substantial legislative purpose of preventing convicted officials from abusing union office to the membership's or public's detriment. In most if not all cases, a direct prosecution under WCA § 8 against the offending officer would achieve that purpose without inhibiting legitimate and protected union activities. Prosecution of the union or of a union officer for knowingly permitting the ineligible employee to be employed is also available under proper circumstances. Such prosecutions, while perhaps inconveniencing the union hierarchy, would not seriously impede the day-to-day functioning of the union and the association of its members.[44] In contrast, by merely threatening a third-party, such as an employer, with prosecution under the dues-collection prohibition, the Commission has the power, unchecked by procedural safeguards, effectively to incapacitate the union. Barring convicted felons from union employment is a familiar device, as Justice Frankfurter noted in *De Veau* ; but prosecuting their employers and others for engaging in an otherwise protected activity as a device for forcing the felons from office is bizarre.

The resulting burden on constitutionally protected association is. particularly indefensible where, as a practical matter, the individual union members whose associational rights are at stake lack the capacity to effectuate the removal of convicted officials before suffering the grave consequences of a dues cut-off. Thus, absent a showing that resort to the dues-collection mechanism is essential to protect union funds from the speculations of corrupt officers who cannot otherwise be swiftly removed, or to eliminate some other unforeseen danger, use of the mechanism seems unconstitutional. No such showing has been made, or even suggested, in this case.

Summary judgment is therefore granted in favor of plaintiffs declaring illegal the enforcement of the dues-collection prohibition of WCA § 8 against unions or employers. In all other respects summary judgment is granted in favor of defendants. F.R.C.P. Rule 56.

SO ORDERED.

---

**44.** Plaintiffs do not allege that such prosecutions themselves would unconstitutionally impinge on the union members' freedom of association. In any event, freedom of association does not go so far as to guarantee union members the right to be represented by a particular individual no matter what the circumstances. *Cf. De Veau v. Braisted, supra.* And, any inter-

ference with members' association that a fine imposed against the union under WCA § 8 or a prosecution against a union official who knowingly permits a violation of the statute might generate is so slight as not to have constitutional significance. These remedies are sufficiently narrow to survive constitutional scrutiny.